STATE v. MARSHALL PERKINS, Appellant.—No. 39922.—198 S. W. (2d) 704.

Court en Banc, December 9, 1946.

Rehearing Denied, January 13, 1947.

*Carl R. Johnson* for appellant.

*J. E. Taylor*, Attorney General, and *W. Brady Duncan*, Assistant Attorney General, for respondent.

LEEDY, J.—Appellant (to whom we shall refer as defendant) was convicted in the Circuit Court of Jackson County of the offense of rape. He has appealed from the judgment sentencing him,

in accordance with the verdict, to the extreme penalty; but he has filed no brief. He is a negro, either 50 or 59 years of age (at the time of trial), and was charged as an habitual criminal under Secs. 4854, 4855, R. S. '39 and Mo. R. S. A. Notwithstanding his formal admission of his several prior felony convictions, imprisonment thereunder, and subsequent discharges[1] the jury made no finding in its verdict on that aspect of the case. In the trial court he was defended by two attorneys, one of whom the record shows was appointed by the court upon his own designation and request.

During the evening of Saturday, June 2, 1945, the prosecutrix, Gladys, a 13-year-old white girl, attended a picture show at a neighborhood theatre on Independence ▓▓▓▓ Avenue near Prospect in Kansas City. The alleged offense was committed while she was returning to her home at 2613 East 11th Street, a distance of 5½ blocks. The show was over about 10:30 P. M., and Gladys, and three friends, all children (Rosalie and Wilda, each 11 or 12 years of age, and Wilda's six-year-old brother, Billy) walked south together on Prospect to 9th Street, where Rosalie, Wilda and Billy entered a tavern to join the parents of Wilda and Billy. From 9th Street Gladys proceeded alone. She continued south on Prospect to 11th Street, and turned east on 11th. Her home was on the south side of 11th about a half block east of Prospect. While yet with the other children she had noticed a negro walking in the same direction on Prospect, but on the other side of the street. As she was turning east off of Prospect onto 11th Street, she observed the negro at sufficiently close range under the street light at that intersection to be able to describe his dress. She walked a short distance east on 11th Street, and when at or near an alley intersection, the negro came up behind her, grabbed her by the throat, and told her to be quiet. She screamed and he said, "Shut up, or I will cut your throat." He dragged her north into the alley, and then she fainted or lost consciousness. The next thing she remembered was hearing her father call. She was then on the dirt floor of a tin garage in the alley (150 or 200 feet north of 11th Street), and the defendant's body was over hers. When the father came to the garage door and called, the negro got up and ran.

Rosalie and Wilda had stopped at the tavern only momentarily, and then proceeded to Rosalie's home at 1019 Prospect. Wilda and her little brother did not testify, they having in the meantime removed from Kansas City. Rosalie testified that as she and Wilda

---

[1] A term of 5 years in the Missouri Penitentiary on conviction in Lafayette County (1915) for assault with intent to kill; A term of not less than 5 nor more than 10 years in the Kansas State Penitentiary on conviction in Saline County (1929) for burglary in the second degree; A term of not less than 5 nor more than 15 years in the Michigan State Penitentiary on conviction in Oakland County (1935) for breaking and entering a railroad car in the nighttime.

reached her home, she heard some screams coming from the direction in which Gladys lived; that she and Wilda returned at once to the tavern, and thence to Gladys' house, where it was found that Gladys had not yet returned. Gladys' parents had retired. They dressed quickly and instituted search for the child, and Rosalie called the police. The father went north up to the alley to some garages, striking matches and looking along the sides of the alley. He testified he heard a moan and started to the garage door, and as he did so, "out this fellow (defendant) popped." The negro attempted to strike him, and he attempted to strike the negro. The father thought that he "did kind of touch him, that is all, because he was going away from me." When he jerked the door open, and found his daughter lying on the floor, "her clothes was tore off of her, scattered around the garage." The negro ran south down the alley, and the father gave chase. He called to his wife, who was standing at the mouth of the alley at 11th Street, and told her to stop him. There was a street light nearby. The wife stuck out her arm and the negro "hit her arm and just turned her clear around." He ran south across 11th Street, and continued down the alley until he reached an east and west alley, then turned west. By the time he reached Prospect the father had gained ground, and was within 10 feet of him when the father fell. There was a street light at that alley entrance,—"there sure was plenty of light"—and the negro "was running and looking back," and the father "got a good look at his face as he went across Prospect." He also observed the negro's dress. After the father fell, the negro "pulled away", continuing in the alley west toward Wabash until he ran between two apartments, disappeared, and was lost in the darkness.

Gladys came out of the garage crying, and her blouse, skirt and panties were missing, and her petticoat was torn, "split clear down the front to the bottom seam." She was taken home, and when the police arrived, they found her in a semi-hysterical condition. "Her throat was black and blue with fingerprints on her neck, and on her chest were skinned places." Her coat or jacket, panties (which had been torn off of her had a hole in them—"looked like a piece missing as if it had been cut"), a torn piece of the blouse material containing the buttons, her novelty pin, and two handkerchiefs (one of which was hers) were found scattered over the floor of the garage, and in that condition photographed by the police.

The police took her at once to General Hospital for examination. Without setting forth the findings of Dr. David H. Glenn, the examining physician, it is sufficient to say that he testified to unmistakeable evidence of penetration, and gave it as his very definite opinion there had been penetration. At the police "show up," on Tuesday morning, defendant was identified by prosecutrix and her

parents, who were likewise positive in their identification of him at the trial.

Defendant was arrested on Monday, June 4, and confessed. On Tuesday morning a recording was made of another conversation he had with a police officer wherein he detailed the crime. Very shortly thereafter he signed a written confession. The recording was "played to the jury", and his written confession was received in evidence. In substance, (and omitting certain formal recitals and matters not here relevant), they were both as follows: He gave his age as 59, widower, residing at 3230 East 9th where he was janitor of some apartments. Saturday afternoon he separately purchased and drank two bottles of wine and two bottles of beer, went home and changed his clothes, then bought another bottle of wine; then went to his brother's house in the six or seven hundred block on Harrison or Campbell where he met another brother and their sister; then all went down on the Avenue [Independence], and went to two taverns and drank whiskey, beer and wine until about 11:30 when the taverns were getting ready to close; they left the tavern, and he walked a little way with his brothers and sister, and they went their way, and he went his.

The written statement continues, "I was pretty tipsy and I walked down Harrison to 7th Street and across 7th Street to Prospect. I kept on walking south on Prospect to 10th or 11th Street. I do not remember whether it was 10th or 11th Street but I saw a white girl walking east from Prospect. This girl looked to be about 16 years old. I asked her where she was going and she said she was going home. I said: 'Can I walk that way with you?' She said she did not care if I did not bother her. I told her I would not bother her. I then placed my arm around this girl and were at the alley at this time, just east of Prospect. I said: 'Let's go up this way'—meaning the alley. She said: 'No, I'm going home'. At this time I led this girl north into the alley with my hand on her shoulder. She did not fight, or try to get away, and we walked north into the alley until I saw an open garage. I stopped in front of the garage and said: 'Come on in here—let's have a good time'. She said she wanted to go home and I again told her to 'come on and then you can go home'. I told her not to be frightened that I would not bother her unless she hollered. I led her into the garage with my arm around her shoulder. When we got into the garage I pushed her down on the ground and pulled down her panties. This girl tried to get up and I held her down, took out my privates and got on top of her. I put my privates into her a little and she said in a loud voice: 'Get up you are hurting me.' I then heard some one say: 'What are you doing in there'. This sounded like a woman's voice. I got up and ran, leaving the girl in the garage. I continued to run through different alleys and across streets, believing that some one was chasing me. I do not recall just

what alleys I ran through, but just kept on running until I got to my home.''

Defendant was the sole witness called in his behalf. He testified he lived in the 3200 block on East 9th Street where for four months prior to his arrest he had been janitor of an .apartment house. He also did odd jobs in the neighborhood, such as janitor work at drug stores, including one at 9th and Prospect. He detailed his activities during the whole of the day in question. He testified he had had some wine and beer during the afternoon, and abôut 5 :30 P. M., he changed his clothes, returned to one of the drug stores, got another bottle of wine and went down on Harrison to his sister's. He further testified he spent the evening in dancing and drinking four or five bottles of beer with his brother (or brothers) and sister and another couple at a beer joint near Independence and Harrison until the place was closed at 11 :30; that he then walked home alone via Harrison to 8th, thence to 9th, and directly east on 9th until he reached home about 1 A. M. He denied having committed the offense, or even being on 11th Street. He also denied having been dressed on Saturday as described by the state's witnesses. He also denied (contrary to his admission on the preliminary inquiry as to its voluntariness) having made the phonographic recording, or knowing of its existence until the trial. There were other discrepencies in his testimony in reference to such matters as his age and education, as well as in relation to what transpired on the night in question, and subsequent to his arrest. But as these were matters for the jury, and it found against him, they need not be noticed. He sought to avoid the effect of his confessions as having been involuntarily made, the facts in relation to which will be stated in the course of the opinion in connection with that point. He admitted not only the several prior felony convictions hereinabove mentioned, but others as well, including one for murder..

██ Under the facts above outlined, there cannot be the slightest doubt that a case was made for the jury, and this would be true if the confessions were entirely disregarded. Consequently, the assignment that the court erred in refusing to direct an acquittal must be disallowed.

██ Turning to the question of the voluntariness of the confessions, it will be recalled that defendant was arrested about noon on Monday, June 4. The arrest was made by detectives Eldridge and Hoedl; and they took defendant to police headquarters. About 1 P. M., Lieut. Welch talked with defendant alone in one of the offices of the homicide bureau, during the course of which he made an oral confession, but the text was not elicited further than his admission that he had sexual intercourse with prosecutrix. The next morning (Tuesday) he was in the regular police ''show up'', and then taken to the laboratory on the sixth floor where the recording was made be-

tween 10:47 and 10:57 A. M. The recording mechanism was in one room, and in an adjoining room was a microphone on a table, and one suspended from an overhead light fixture. The conversation was picked up by the microphones, and simultaneously recorded on a disk in the recording room. It is not disputed that the written confession was made at 11:15 A. M. on that morning, as appears from the writing itself. The written confession was offered first, defendant objected, and a preliminary inquiry was held out of the presence of the jury on the question of its admissibility. In this connection the state's evidence showed that there were no threats, nor promises of immunity. Defendant sat in a chair, and was questioned by Officer Hoedl, in the presence of Officer Eldridge and a stenographer. Defendant was informed that the statement "would be used against him in court, and he didn't have to sign it unless he wanted to;" and he said, "Yes, I will sign it." The statement was reduced to writing, and when he said he could not read, it was read over to him, and he signed it.

Testifying on the preliminary inquiry, defendant admitted that he signed the statement, but said he did so "because they told me if I can't sign it would be worse on me. . . . They say, 'We got your record, your fingerprints, you are going to lose the case, you might as well get small time'"; that "some tall fellow stood over me, and called me a black bastard, and said, 'If you don't sign that I will knock your black brain out.' I just signed them because I didn't want to get beat up." He further testified that the officers asked only his name, and where he lived; that the statement was already prepared, and they "keep throwing me my pictures and say, 'This record is going to stick you.' And I said, 'It will have to, because I ain't going to lie on myself.' I don't want to get beat up and so I signed." He specifically denied he had stated, as shown by the confession, that he had been drunk or drinking on the night in question, or that he went somewhere with his brother, or met or followed the prosecutrix. On cross-examination he admitted that when he went up to the sixth floor and talked to Lieut. Welch "about what happened that night" he was told and knew they were making a recording, and it was explained to him that both the recording and his statement could be used against him in court; that after making the recording Lieut. Welch asked if he would go downstairs to the homicide bureau and make a signed statement, and he consented. While testifying on the merits, he admitted that everything else said by him in the confession was true, and had been stated by him, except that in relation to the assault upon prosecutrix, and his presence near 11th and Prospect.

There was nothing in the state's proof which would render the confession inadmissible as a matter of law. On the contrary it constituted a substantial basis for finding both confessions were volun-

tary. It was not contended there was any prolonged or continuous questioning or that defendant was deprived of food or sleep. Indeed, under defendant's own testimony, his proof touching the nature and extent of threats and coercion is to be regarded as somewhat mild when compared with the usual pattern sought to be established in such cases. On the conflicting evidence thus adduced on the preliminary inquiry the court ruled the confession admissible, and it was received in evidence. The question of its voluntariness was one ultimately for the jury, to which the issue was properly referred under an instruction given at defendant's request. See State v. Gibilterra, 342 Mo. 577, 116 S. W. 2d 88, 95, and the extensive footnotes therein on the point.

The assignment of the motion for new trial that the court erred in admitting "an alleged recording of defendant's voice in ingenious novelty" is insufficient, under Sec. 4125 R. S. '39 and Mo. R. S. A., to preserve anything for review; but in cases where, as here, "a human life is the forfeit," we have, nevertheless, examined assignments not properly preserved. State v. White, 330 Mo. 737, 51 S. W. 2d 109. The question of the admissibility of phonographic recordings is one upon which there is no precedent in this jurisdiction, and in view of this fact, we shall examine into the question to the extent of determining whether defendant suffered manifest wrong or injury by the ruling of which complaint is made. One of the confessions involved in State v. Butts, 349 Mo. 213, 159 S. W. 2d 790, was such a recording. This appears from a statement of facts. The reversal in that case was upon the ground that the confessions were involuntary as a matter of law, under the testimony of the police officers alone. The question of the admissibility of the phonographic recording, as such, was not involved.

The question has arisen in other states, and has received the attention of the text writers. Commonwealth v. Clark, 123 Pa. Super. 277, 187 Atl. 237, involved a prosecution for attempted extortion and bribery. In that case the introduction of "speak-o-phone" records *secretly made* of conversations with the defendant, and playing of the records in the presence of the jury was held proper; the court saying, "The phonograph, the dictaphone, the talking motion picture machine, and similar recording devices, with reproducing apparatus, are now in such common use that the verity of their recording and reproducing sounds, including those made by the human voice in conversation, is well established; and as advances in such matters of scientific research and discovery are made and generally adopted, the courts will be permitted to make use of them by way of presenting evidentiary facts to the jury."

The principle involved is the same as that in relation of the admissibility of talking motion pictures. In People v. Hayes, 71 Pac. 2d 321, a sound motion picture of the defendant making a confession to

the police was reproduced to the jury over the objection that the reception of such evidence was prejudicially erroneous to the defendant, and this was the single point in the case. In upholding the conviction, the court said that such reproduction "stands on the same basis as the presentation in court of a confession through any orthodox mechanical medium, that is, there is a preliminary question to be determined by the trial judge as to whether or not the sound moving picture is an accurate reproduction of that which it is alleged occurred. If after a preliminary examination, the trial judge is satisfied that the sound moving picture reproduces accurately that which has been said and done, and the other requirements relative to the admissibility of a confession are present, i. e., it was freely and voluntarily made without hope of immunity or promise of reward, then, not only should the preliminary foundation and the sound moving picture go to the jury, *but, in keeping with the policy of the courts to avail themselves of each and every aid of science for the purpose of ascertaining the truth, such practice is to be commended as of inestimable value to triers of fact in reaching accurate conclusions.*

"This particular case well illustrates the advantage to be gained by courts' utilizing modern methods of science in ascertaining facts The objection is frequently heard in criminal trials that a defendant's confession has not been freely and voluntarily made, he testifying that it was induced either by threats or force or under the hope or promise of immunity or reward, which is denied by witnesses on behalf of the People. When a confession is presented by means of a movietone the trial court is enabled to determine more accurately the truth or falsity of such claims and rule accordingly." [Italics, the present writer's.]

In Boyne City, G. & A. R. Co. v. Anderson, 146 Mich. 328, 109 N. W. 429, the Supreme Court of Michigan approved the use of a phonographic recording of sounds claimed to have been made by a train, this on the principle of the admissibility of telephonic communications. The court observed, "The ground for receiving the testimony of the phonograph would seem to be stronger, since in its case there is not only proof by the human witness of the making of the sounds to be reproduced, but a reproduction by the mechanical witness of the sounds themselves." See Wigmore's "The Science of Judicial Proof" 3d Ed., p. 487; Wharton's Criminal Evidence, 11th Ed., pp. 2340-2344. In the 1943 pocket supplement to Wigmore on Evidence, p. 32, sec. 852, it is suggested to the end that "both brutality and falsities may be presumed to be the rare exception rather than the habit," a rule of court be promulgated providing, as the first condition upon which a confession will be receivable in evidence, that "The interview at which the alleged confession was made *must be recorded on a sound film,* the record showing the place, the date

860

and hour, the names of every person present, and all statements made by any person present." (Emphasis supplied.) See, also, Commonwealth v. Roller, 100 Pa. Super. 125, and Commonwealth v. Allbright, 101 Pa. Super. 317. In the former the court referred to "the receptive attitude of the law toward any reliable mechanism produced by scientific knowledge for the discovery or recording of facts;" and in the latter said, "This commonwealth is wisely committed to the principle that progressive and scientific appliances and methods which belong to the various human endeavors belong equally to the machinery of the law." The proper foundation having been laid by the proof with respect to the use of this method of reproducing an accused's voice (of which no complaint is made), it is obvious that the recording in this case was properly received, and defendant is in no position to complain on that ground.

The motion for a new trial, while complaining on both of these scores, does not specify any evidence which was improperly received against defendant, nor any offered by him and improperly rejected. Neither has been discovered upon a careful examination of the record. The motion complains of improper argument on the part of the prosecution. The bill of exceptions preserves all the arguments, and for aught that appears, not a single objection was interposed. This is probably accounted for by the fact that the arguments were, in their entirety, within proper and legitimate bounds.

The record proper has been examined, and found to be regular and sufficient. The issues were fully and fairly presented under instructions in approved form. The trial was conducted on a high plane, and was in every way fair to the accused. It ▆ follows that the judgment must be, and it is, affirmed.

Date of execution set for January 24, 1947.

All concur except *Gantt, J.*, not sitting.