**STATE of Missouri, Respondent,**

v.

**Loyal "Bud" LONG, Appellant.**

**No. 47910.**

Supreme Court of Missouri,

Division No. 2.

June 13, 1960.

Vernie R. Crandall, Arkley W. Frieze, Frieze & Crandall, Cartage, for appellant.

John M. Dalton, Atty. Gen., Robert T. Donnelly, Sp. Asst. Atty. Gen., for respondent.

## NICK T. CAVE, Special Commissioner.

Appellant (to whom we shall refer as defendant) was convicted in the Circuit Court of Adair County for burglary and stealing and sentenced to the penitentiary for five years for burglary and three years for stealing. He duly perfected his appeal.

The information charged defendant with breaking and entering a grocery store owned by Mackie & Williams, Inc., and stealing therefrom certain specified items of personal property of the value of $631.98. The sufficiency of the information is not questioned.

 ██ The evidence was sufficient, if believed, to establish that *someone* did feloniously break and enter the store and steal personal property valued at approximately $630, and we need not detail such testimony. However, the defendant contends that his motion for directed verdict of acquittal should have been sustained because there is no evidence that Mackie & Williams, Inc., was a corporation and the owner of the stolen goods. It was not necessary to allege or prove the legal status of the owner of the goods stolen. State v. Hedgpeth, 311 Mo. 452, 457, 278 S.W. 740, 741; State v. Zammar, Mo.Sup., 305 S.W. 2d 441, 442. When all the evidence and circumstances are considered, we think it is sufficient to submit the issue of ownership in Mackie & Williams. Witness Durbin testified that he was the manager of the Mackie & Williams Food Liner; that when he entered the store the morning after the burglary, he observed that the safe had been beaten all to pieces, and that there was debris all over the floor and all kinds of damage in the front of the store; that he made an inventory and found certain items of merchandise missing. He enumerated the various items and the value of each; that a coffeepot and wicker basket which were found near the store by the police were definitely out of the store.

Witness Bagley testified that he was a meat cutter at the store, and that a part of a ham that was found nearby the morning after the burglary was from the store, and that several hams were missing.

The court did not err in overruling defendant's motion for directed verdict because of failure of proof of the incorporation of Mackie & Williams, or for failure of proof of the ownership of the stolen goods.

Defendant's principal ground of prejudicial error is the admission of the testimony of witness Highway Patrolman Paul Jones. This testimony relates to certain alleged statements made by defendant and recorded on a tape recorder installed in the jail where defendant was confined.

Garland Winn testified that he was chief radio operator for the State Highway Patrol; that he installed a tape recorder in the jail at Lancaster, Missouri; that the microphone was located in a certain cell of the jail in the basement of the court house and the recording equipment was located in the circuit court room on the third floor thereof; that the recorder could be turned on and off by pressing a "start button;" and that there was a "headset connection," or, as one witness said, "earphones," which would permit the operator to hear the same conversation that was being recorded. This witness did not operate the recorder.

Witnesses Staggs, of the highway patrol; Homer Adams, Sheriff of Schuyler County; Ronald Farrell, an amateur radio operator; James Russell, a television engineer; and Paul Jones, highway patrolman, all testified concerning the installation and working condition of the recording equipment. However, Paul Jones was the only person who operated the recorder during the time the conversations were being monitored, which extended for two or three days.

After the recording equipment had been installed, the defendant was transferred to the jail in Lancaster, and the only other occupant therein was a man by the name of Hicks. Jones testified that he had talked with the defendant and Hicks, and could distinguish their voices; and that during the time he was making the recordings, he was also listening to the conversations. The tape recordings were produced in court, and when the prosecuting attorney attempted to question Jones about the contents thereof, defendant objected because the recordings would be the best evidence. The objection was sustained and the recordings were offered. The defendant and his counsel had no prior knowledge of the making of the recordings, and objected to their introduction on several grounds. After consultation, it was agreed that the portions of the recordings which the state wanted to introduce would be "played" in the hearing of the court, but out of the presence and hearing of the jury. This was done, and defendant renewed his objections, giving several reasons therefor, one of which was that the recordings were so indistinct and unintelligible that they would have no probative value. The court sustained the objection and stated, "I think you are right as to the clarity of the recordings. I don't think the jury can understand it. It is not plain enough, it would have to be interpreted, and I will sustain that and permit witness Jones to testify to what he heard. * * * The only reason I am sustaining the objection is that I don't think the jury can understand the recordings." To this the prosecuting attorney replied, "I think you are right." The Court: "I am going to permit Jones to testify to what he heard the defendant say."

We quote the testimony that was thereafter admitted over objections. Prosecuting Attorney:

"Q. Have you checked these recordings more than one—several times—gone over them? A. I have gone over the recordings several times.

"Q. Is it material you recorded? A. Yes, it is. * * *

"Q. I would like for you to tell the jury what in the way of admissions you heard on record No. 1, that you recorded of the conversations of Mr. Hicks and Mr. Long * * * admissions made by the defendant."

For purpose of objection, defendant's counsel was permitted to ask the witness:

"Q. Were these admissions that you are about to testify to, were they stated or made in your presence? A. No.

"Q. You are about to refer to a piece of paper you have laying on your lap, is that correct? A. Yes. * * *

"Q. When did you make the notes which you now hold in your hand? A. These were made at the time that we listened to the recordings, after they were recorded. * * *

"Q. So, the instrument * * * which you hold in your lap, was not made by you at the time the admissions were made * * *? A. That is correct.

"Q. And so far as refreshing your memory goes, they are only refreshing your memory as to what you heard played on the tape recorder in listening to it, isn't that so? A. That's correct."

Defendant objected to the witness testifying from notes he had made after replaying the tape records several times, which recording the court had excluded because it was not understandable. The prosecuting attorney then asked:

"Q. Is this the same information you heard when you made the recordings? A. Yes, it is.

"Q. The information on those three tapes, do they contain the exact information that you heard when you made the recordings * * *? A. Yes.

"Q. In other words, after making these recordings, could you remember what ad-

missions had been made? A. I could remember some of them, but not right out of context or word for word."

The court overruled defendant's objection and stated that it would be understood that defendant was objecting to the subsequent testimony without renewing objection to each question.

Thereafter, Trooper Jones was permitted to testify as follows:

"Q. Now, Trooper Jones, *as to recording No. 1, were there statements made by the defendant, or admissions made by the defendant as to amount taken from the Mackie & Williams Food Liner?* A. Yes, there was.

"Q. What was the statement? A. *On record No. 1 Long states that there wasn't even one-tenth of the amount alleged really taken. States that there wasn't even one-fifteenth—discussed generally that there wasn't near as much taken as what he was charged with.*

"Q. Did he later on make any further statements about one-fifteenth, etc.? Will you tell us what he said? A. This conversation took place on the same tape, record No. 1. Well, according to the timer on the recording of the time, was taken from the timer, it is timed 2:30 to 2:36. This conversation went on to say,—Hicks stated, 'That would be pleading guilty to something that you didn't do,' and Long says, 'Yeah, it would.' Hicks says, 'I don't know what the thought was,' and Long goes on to say, 'I wouldn't plead guilty if they had the truth down, let alone a lie, that much of a lie. That's about one-fifteenth of the truth.' * * *

"Q. *Was there any preface to this remark about the Mackie & Williams store and the robbery?* A. *Yes, there was.* * * *

"Q. Now would you tell me, on Tape 1, at point 236 to 243, approximately, what was stated? A. Hicks made the statement, 'They had to exaggerate because they have

to make a profit.' Long says, 'That's the worst exaggeration I have ever seen. I have had several charges on me, but that's the first time I have ever seen them exaggerate that much.'

"Q. Now, record No. 1, point 215 to 225, what was stated? *Let me ask you again before we go to that: Preceding this last quotation you have made, was there any reference to the Mackie & Williams robbery?* A. Yes, there was." The court first sustained an objection to the witness giving his opinion as to what the conversations referred to, but when the prosecuting attorney argued that "We are merely trying to get this without going through the whole conversation," the court overruled the objection and the inquiry proceeded.

"Q. *What in reference to—in the conversation preceding this, whether it was referring to the Mackie-Williams burglary and stealing which took place and so forth, with which he is charged?* A. You want this?

"Q. Yes. *Now what was this referring to?* A. *215 to 225 was also referring to the Mackie & Williams robbery and so forth.*

"Q. Now would you read that statement? A. 'There wasn't one candy bar took out of that place, let alone 400 pounds of candy. There wasn't a drop of coffee took out. They had two cases. They had two cases of cigarettes and I think there might have been a carton and a half took out—two cartons, maybe, at the most. They have two cases of cigarettes missing.'

"Q. Now, would you tell us what it says on Record No. 1 at point 336 to 346? *Again, what it refers to?* A. *This is also referring to the Mackie & Williams robbery or burglary.* Hicks asked the question: 'How many of those irons did they have—' *referring to the charge that was read to him*—Long answers, 'Two.' Hicks asked again, 'How many "whatchamagiggers?"'' Long answers, 'Two.' Hicks,

'What the hell else was it they took?' Long answers, 'Coffeepot.' Hicks: 'How many of them?' Long answers, 'One. One, I think,' Long says. Long goes on to say, 'They lied half-way on two of them and all the way on another.'

"Q. Now, we will go on to Recording No. 3. *Would you tell us what it refers to* and what was stated at point 420 to 430? A. Hicks and Long are talking *about a person by the name of Shields.* Hicks says, 'I don't know whether Shields could actually hang you, but he could sure make it rough.' Long: 'No, he can't.' Hicks, 'Well, he seen all that stuff the next morning.' Long: 'He didn't see much.' Continuing, Long states, 'Very little he seen.' Long continues to say, 'Bet he can't tell today what he seen besides that change. Yeah,' he said, 'it was in a poker game.'

"Q. Now, would you tell us what is on recording No. 3, *what it refers to, between points 460 and 480?* A. *Long again is referring to the charge sheet that was read to him and Long states:* 'Two cases of coffee completely off. That's at least one electric iron and one mixer off.' *Long at this point had just been furnished a copy of the information and they are inspecting the same thing*—'a coffee pot off, and that other, I can't recall the name of is off; candy is off completely; and they had another item or two, off; hams are off.' Hicks asks the question: 'Well, there was only about six hams, five or six.' Long says, 'No, four or five,' and Long says— *referring to the charge sheet*—'fourteen,' and then he laughs.

"Q. Now, tell us on record No. 3, what the conversation was between 768 and 778. A. Long states: 'Could you lie a little bit?'—this was addressed to Hicks. Hicks: 'I suspect.' Long: 'Could you say there was a poker game going on when you came in?'—*referring to the morning after the robbery when Hicks was supposed to have come in the trailer where Shields lived.* Hicks: 'Yes, I imagine so.' Long: 'That's all it takes.' Hicks: 'I suspect I was play-ing in the poker game while I was there.' Long: 'And you had some change on you and you lost it, but you don't know how much, a dollar or so.' Hicks: —Hicks said, 'Lost a few dollars.'" (Italics ours.)

There was no other substantial evidence connecting the defendant with the robbery.

We are not confronted with the question whether the tape recordings should or should not have been admitted in evidence; and the cases discussing that issue are of little value in determining the competency of the testimony of witness Jones quoted supra. For cases discussing the admissibility of sound recordings, see State v. Perkins, 355 Mo. 851, 198 S.W.2d 704, 168 A.L.R. 920; 58 A.L.R.2d 1024, et seq.

■■ It is true, of course, that voluntary statements made by a defendant in a criminal case are admissible. But it is quite apparent that witness Jones was not relating statements of defendant that he had heard at the time of the recording, but rather was reciting excerpts or parts of statements he could understand after replaying the records many times, and putting his own interpretation on what the statements referred to. Assuming, without deciding, that Jones would be permitted to refresh his memory by replaying the records, which had been excluded, nevertheless he certainly should not be permitted to give his opinion as to what the defendant was referring by such fragmentary statements. "It is a well-settled principle of the law of evidence that a witness who has heard a statement or conversation should not be permitted to state his conclusions as to what was stated or admitted." O'Neill v. United States, 8 Cir., 19 F.2d 322, 325. That is precisely what Jones was permitted to do in this case.

The connection, if any, between the Mackie-Williams robbery and the random statements of the defendant was a vital element of the state's case and could not be established by Jones' interpretation of such statements. There was no other sub-

stantial evidence connecting defendant with the robbery. Consequently, the admission of this improper testimony was prejudicial.

For the error in the admission of evidence, the judgment should be reversed and the cause remanded. The Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion by CAVE, Special Commissioner, is adopted as the opinion of the court.

All concur.