Commonwealth *v.* Clark, Appellant.

280

Argued April 13, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Maurice R. Metzger* and *Oliver K. Eaton,* for appellant.

*John C. Arnold,* with him *E. M. Biddle, Jr.,* Special Deputy Attorneys General, and *Karl E. Richards,* District Attorney, for appellee.

OPINION BY KELLER, P. J., September 30, 1936:

The defendant was convicted on an indictment containing four counts: (1) Attempted extortion in connection with the agent's commissions on insurance to be taken out on behalf of the Pennsylvania Liquor Control Board; (2) attempted extortion in connection with an appointment to a position under the Public Service Commission; (3) bribery relative to the commissions on insurance referred to in the first count; (4) bribery relative to the appointment under the Public Service Commission referred to in the second count. The indictment set forth that the defendant was a Senator of the General Assembly of the Commonwealth of Pennsylvania at the time of the commission of the alleged offenses and that the acts charged were done unlawfully, wickedly, wilfully, corruptly and dishonestly and under color of his office as aforesaid. A general verdict of guilty was rendered on which the court sentenced the defendant to pay the costs of prosecution and a fine of $4000. The condition of defendant's health moved the court not to impose sentence of imprisonment. Defendant appealed.

The evidence on behalf of the Commonwealth tended to prove: That defendant was chairman of the Senate Appropriations Committee and in practical control of the appropriation bills to be reported to the Senate; that he was also senior partner in the insurance firm

of Clark and Hulme, with offices at West Chester, Pennsylvania; that in December, 1934, his firm had obtained the agency award of certain insurance protecting the Pennsylvania Liquor Stores, which had been allocated from Governor Pinchot's office, and had received a commission of thirty per cent of the premiums paid, or $10,852.14, of which his firm had turned over two-thirds, or $7234.76, to one Morgan Bird, an attache connected with Governor Pinchot's office force, who had shortly before been appointed a sub-agent of the company represented by defendant's firm; that defendant was desirous of renewing this insurance under the new administration which had been inducted into office in January, 1935, and approached Harry E. Kalodner, Governor Earle's private secretary, who had the naming of the persons or firms who would be designated agents for the insurance companies that should be awarded insurance contracts, and proposed that he would report to, and procure the passage through, the Senate of certain appropriation bills in which the Governor and his administration were specially interested provided his firm was designated the agent to whom the commission was to be paid in case the insurance company represented by him should be awarded the contract insuring the State liquor stores; and in the event that this was not done, that his partner, Hulme, or some other person to be named by defendant, should be appointed to a position on the staff of the Public Service Commission, in connection with the investigation of rates, etc., of the Philadelphia Rapid Transit Company, for which an extra appropriation of $250,000, was desired; that defendant also approached the Attorney General, Charles J. Margiotti, along the same lines, with the purpose of inducing him to persuade Kalodner with respect to the insurance, or securing the aforesaid appointment on the staff of the Public Service Commission; that the Governor was informed of

these overtures from the defendant and pursuant to directions from him, a speak-o-phone, the trade name of a form of dictaphone, or phonographic recording instrument with an aluminum metal disk, instead of a wax recording disk, and equipped with two ear phones, was installed in the offices of the Attorney General, the microphone or receiving instrument being placed in his private office and the amplifier and recording devices, which were connected with the microphone by wires, in an adjoining office. When this apparatus had been installed and tested, an appointment was made with defendant who came to the Attorney General's office, with Mr. Kalodner, on June 18, 1935, about 6:30 o'clock P. M. and met the Attorney General there. No one else was present in the private office, but in the adjoining room, where the speak-o-phone recording instrument was placed, were a representative of the speak-o-phone firm, an expert of the State Police familiar with instruments of this nature, one Bastow, a stenographer or court reporter, and a deputy attorney general or two. The stenographer and one of the others used the ear phones and could hear the conversation as it was recorded on the metal disks, six of which were used, on both sides. It is not necessary to give the details of the conversation between the three, the Attorney General, the Governor's private secretary and the defendant. It tended to support the alleged previous proposals made by the defendant as to the personal benefits he desired in return for favorable action on the appropriation items in which the Governor and his administration were specially interested.

The defendant did not deny the conversation as recorded on the speak-o-phone. On the contrary, he admitted that it had occurred as recorded on the metal disks, but averred that his motive in going to the conference and discussing the matter with the Attorney General and the Governor's private secretary was not

corrupt but that it was done in an endeavor to learn
how far the latter (Kalodner) would go respecting
certain corrupt proposals which he had previously made
defendant in an effort to induce him to support a bill,
known as the Ripper bill, the object of which was to
oust the Mayor of Pittsburgh from his office, and sub-
stitute some one more in sympathy with the new ad-
ministration. His story was that he had first been ap-
proached by another State Senator, who informed him
that the Governor would permit him to name the judge
to fill the vacancy in the Courts of Chester County if
he would support the Ripper bill; that Kalodner sub-
sequently made the same proposition to him, on behalf
of the Governor, and also first advanced the proposi-
tion as to the insurance commissions and the appoint-
ment of his partner, or some one to be named by de-
fendant, to the staff of the Public Service Commission
in the investigation of the Philadelphia Rapid Transit
Company in return for favorable action on certain ap-
propriation items which were doubtful of passage in
the Senate; that he had informed a number of his fel-
low senators of the offer made to him to name the judge
to fill the court vacancy in return for his support of
the Ripper bill, and that some of them stated they had
been offered similar inducements for supporting that
bill, and had suggested that it would be well to see how
far the proposals for such corrupt bargains would go;
and that his object and purpose in attending the con-
ference on June 18 was to draw out these proposals.
The defendant was supported in some of his statements
by other witnesses. A number of state senators were
called who testified that the defendant had told them
of the offer made to him to name the judge in return for
his vote in favor of the Ripper bill, and that somewhat
similar proposals of patronage had been made them by
other officials connected with the administration, of
which they had told the defendant, and that several

of them had said, if any further attempts to influence them corruptly in their action on the Ripper bill were made by administration officials it would be well to see how far they would go; but no one testified that he had requested the defendant to attend this conference with that end in view.

It is evident that the guilt or innocence of the defendant rested largely on two questions of fact: (1) Who first advanced the corrupt proposal; and (2) the defendant's motive and intent in making the proposals or requests which were recorded on the speak-o-phone; whether it was done to induce the others to act corruptly or only to draw them out and see how far they would go. The jury, by their verdict, found against the defendant on these questions of fact, and as the decision of questions of fact was for them, the verdict must stand unless some reversible error was committed by the court below on the trial.

The errors assigned may, for convenience, be divided into nine heads.

(1) The defendant objected to the introduction in evidence of the speak-o-phone records and their being played in the presence of the jury. The objection is without merit. The phonograph, the dictaphone, the talking motion picture machine and similar recording devices, with reproducing apparatus, are now in such common use that the verity of their recording and reproducing sounds, including those made by the human voice in conversation, is well established; and as advances in such matters of scientific research and discovery are made and generally adopted, the courts will be permitted to make use of them by way of presenting evidentiary facts to the jury.

In *Com. v. Roller*, 100 Pa. Superior Ct. 125, this court sustained the Court of Quarter Sessions of Philadelphia County in admitting in evidence a talking motion picture made while the defendant in that case

was confessing the crime of which he was charged. The apparatus used combined a motion picture with a phonographic record, taken synchronously, so that it embraced within its scope, an instrument similar in principle to the speak-o-phone employed in this case. We said, speaking through Judge GAWTHROP: "The movietone is, in the language of the court below, 'in basic characteristics, no different, on the one hand, from ordinary photography, in regard to the visual picture reproduced, and, on the other hand, from phonographic records, in regard to the auditory recording of sound. The principles that underlie their admissibility into evidence, therefore, differ in no way from those governing the admissibility of still pictures and phonographic records' ...... From time to time the courts have recognized new agencies for presenting evidential matters. The novelty of the talking motion picture is no reason for rejecting it if its accuracy and reliability, as aids in the determination of the truth, are established. In the words of the learned trial judge, 'all knowledge purveys to the law, and from the domains of every art and science it draws the weapons by which it discovers truth and confounds error. The still photograph, X-ray, the dictograph, the finger print, the phonograph, the microscope, and even the bloodhound, have all been used and received by judicial tribunals in the proof of matters depending upon evidence; and, in all such cases, the preliminary investigation was directed to the proper authentication of the evidence, and not merely to the question whether imposture might be successful' ...... Telephone conversations have been freely received in evidence, upon a proper identification of the voice: *Penna. Trust Co. v. Ghriest*, 86 Pa. Superior Ct. 71. The dictograph has also been recognized as a legitimate agency for the discovery of truth: *State v. Minneapolis Milk Co.*, 124 Minn. 34, [144 N. W. 417]. Phonographic records have

been received in evidence, see *Boyne City v. Anderson,* 146 Mich. 328, [109 N. W. 429]. See also 22 C. J. 766. These are but a few of the cases which indicate the receptive attitude of the law toward any reliable mechanism produced by scientific knowledge for the discovery or recording of facts . . . . . . As photographs and phonographic reproduction of sounds have been held to be admissible in evidence, there would seem to be no sound reason for refusing to accept a talking moving picture, which is but a combination of the two when it is shown to be accurate and reliable." See also Wigmore on Evidence, (2d Ed.) Secs. 795(5), 798a, 798b; Sec. 2157 (1934 Supplement) ; Wharton's Criminal Evidence (11th Ed. 1935), secs. 1430-1433; Greenleaf on Evidence, (16th Ed.) sec. 439h; Jones on Evidence (3d Ed.) sec. 581, note 3; *Com. v. Albright,* 101 Pa. Superior Ct. 317, 325, 326. The authenticity of the conversation recorded on the disks offered was not questioned. Indeed, it was frankly admitted by the defendant on the stand.

(2) The conversation between the three persons in the Attorney General's private office was correctly recorded on the speak-o-phone disks, but they did not designate who was talking. This could only be determined by noting the difference in the sound of the voices of those speaking. The stenographer, listening with the ear phone, was familiar with the speaking voice of the Attorney General and Mr. Kalodner, but he did not personally know defendant or his voice. He could tell that it was a third party and that the same person took part throughout the conversation. The Attorney General was present during the whole of the interview and was familiar with defendant's voice and could tell who was speaking during the reproduction of the conversation in playing over the speak-o-phone disks. Hence, when the speak-o-phone was operated in court and the conversation reproduced for the jury,

the Attorney General was called to identify the voices and tell the jury who was talking at the time. This took a great deal of time, and to avoid delay, and only for the purpose of identifying the voices of the respective speakers during the conversation, the Commonwealth was permitted to give to each of the jurors a typewritten transcript of the conversation recorded on the speak-o-phone disks showing who was doing the talking, thus "Senator Clark" appeared in the transcript before his part in the conversation, "Mr. Margiotti" before his part and "Mr. Kalodner" before his part. Defendant's counsel made no objection to this being done, apart from his objection to the use of the speak-o-phone records, and it was admitted that the conversation was correctly allocated to the several speakers, and that defendant said everything purporting to be said by him, that Mr. Margiotti said everything purporting to be said by him and Mr. Kalodner said everything purporting to be said by him. As soon as the playing of the speak-o-phone records was finished, the district attorney collected from the jurors all the transcripts which had been furnished them for the purpose of identifying the voices of the respective speakers while the records were being played (p. 193a) and none of them were taken out with them when they retired for consultation. In view of the tacit agreement of counsel for the defendant that this might be done without waiving any of his objections to the admission in evidence of the speak-o-phone records and their playing before the jury, "in the interests of conserving time of the court and jury and all persons concerned" (pp. 191a, 192a, 543a, 544a), and the fact that because of, and in reliance upon it the Commonwealth did not further pursue its proof of identification of the voices of those taking part in the conversation in the Attorney General's office by the oral testimony of the Attorney General, we are of opinion that he cannot now be heard to object to the

course pursued. It involved no constitutional right of the defendant which could not be waived by him.

(3) We think the court below was very fair and extremely liberal to the defendant in its admission of evidence of his conferences and conversations with certain of his fellow senators relative to the offers made and rumors of offers current for their support of the Ripper bill, and the introduction in evidence of The Batchelor resolution pertaining thereto. They bore, to some extent, on the purpose and intent of the defendant in attending the conference with the Attorney General and the Governor's private secretary; and for that purpose the defendant and seven of his associates in the Senate were permitted to go into these matters very fully, in so far as they might throw some light on that phase of the case. Seventy-five pages of the record were given over to the testimony of the senators called by the defendant and a large part of the ninety-six pages of his own examination as a witness related to his discussion of the subject with his fellow senators, as bearing on his motive and intent in taking part in the conference. The practical difficulty with his case was that if his object in attending the conference was to see how far Mr. Kalodner would go in his offers and proposals on the Ripper bill and that he purposed to draw him out on that matter, it was remarkable that the Ripper bill was not mentioned during the conference, either by him or the Attorney General or Mr. Kalodner. In our opinion nothing offered to be proved by any of the senators called by the defendant, that would reasonably shed any light on the defendant's motive or intent in taking part in the conference was excluded.

(4) Nor was the court guilty of reversible error in refusing to allow the defendant to send out with the jury a copy of the Batchelor resolution adopted in the Senate on June 17, the day before the interview in question, for the appointment of a committee to in-

vestigate charges made as to improper methods used by some administration officials to secure the passage of the Ripper bill. It was not directly involved in the offenses charged against the defendant. If sufficiently relevant to be admissible in evidence, it bore only slightly on the defendant's motive in attending the conference, and that object was attained by reading it to the jury. On this point the learned court below, in its opinion refusing a new trial, etc. correctly said: "Generally speaking, it has been the practice in Pennsylvania to send out with the jury the books and papers which bear directly upon the issue, except that depositions, being in the nature of oral testimony, are not allowed to be sent out. *Commonwealth v. Stanley,* 19 Pa. Superior Ct. 58, 68. But it is settled by a long line of authorities that it is in the discretion of the trial judge as to what papers shall go out with the jury. *Commonwealth v. Murphy,* 92 Pa. Superior Ct. 139, 142; *Commonwealth v. Prescott,* 284 Pa. 255, [259]; *Commonwealth v. Brown,* 264 Pa. 85, [92]; *Ott v. Oyer's Executrix,* 106 Pa. [6], 13, 19; *Cavanaugh v. Buehler,* 120 Pa. 441, 458. However, the party complaining about the refusal to send out a paper must show that such refusal was prejudicial to him. We think there is no such thing shown in this case. The defense in the case was that the defendant had an honest intention in making the proposition at the conference in the Attorney General's Department, for the purpose of ascertaining how far the administration officials would go in offers of patronage because of the rumors which he had heard and the statements made to him by other Senators which culminated in this Batchelor Resolution. The resolution was offered and read. The other reasons which moved the defendant, according to his testimony, to form the determination which he had were given to the jury verbally. We know of no good reason why additional emphasis should be put

upon this resolution by sending it out to the jury. Exhibits which ought to be sent out to the jury room are such that will enable the jury, from a close inspection of the papers, to better determine the facts. Maps, plans, deeds, or instruments alleged to have been altered or forged, are illustrations of the kind of exhibits which a jury should have, but an exhibit which merely permits the jury to read over again what amounts to oral testimony already given should not be sent out unless there is some impelling reason therefor. We find no such reason in this case, and we think the refusal to send the Batchelor Resolution out was proper."

(5) During the conversation between defendant, the Attorney General and Mr. Kalodner as reproduced on the speak-o-phone—and admitted by the defendant to have been correctly reproduced—Mr. Kalodner, in discussing the insurance on the liquor stores stated that the new administration, by its method of awarding insurance, had saved the Commonwealth $13,000. The defendant, at the time, took no exception to this statement. On the trial his counsel offered to prove that instead of saving the Commonwealth this amount, there was an increase in expense to the Commonwealth of about six thousand dollars—for the purpose of affecting Mr. Kalodner's credibility. Mr. Kalodner had given no evidence on the subject during the trial. The offer related to a collateral matter wholly foreign to the issues being tried and was properly excluded. The credibility of a witness cannot be attacked by proving specific instances of alleged false statements concerning collateral matters, made out of court on other occasions.

(6) We think it was within the discretion of the court to permit, or to refuse to permit, Mr. Kalodner, in rebuttal, to refer to matters, not previously testified to by him, which tended to confirm his prior denial that

he had offered defendant the naming of the judge in Chester County if he would vote for the Ripper bill. See *Puloka v. Com.*, 323 Pa. 36, 185 A. 801.

(7) It was wholly immaterial whether Bastow, the stenographer with the ear phone in the adjoining room, took down the conversation correctly in shorthand or transcribed his shorthand notes correctly. Neither the stenographic notes nor his transcript of them was offered in evidence or read to the jury.

(8) Appellant complains of the use of the word "may" in the following extract from the court's charge, and contends that it was erroneously used for "must", and constitutes reversible error: "If there were no connection between the previous solicitations, assuming that you find them to be the truth, as stated by the defendant, and the conference on June 18th, then that would not offer a defense to the defendant, if he went to that conference independently of any previous solicitation. If, however, you find that there was a connection between the two, and that he went there because of the previous solicitation, and not for the purpose of corruptly soliciting something for himself or to his advantage, but merely to follow up what had previously gone before, to see how far the other side would go, then it *may* offer such explanation as would *at least* raise a reasonable doubt in your mind and enure to the benefit of the defendant." But the extract must not be isolated, and is to be read in connection with the charge as a whole. The trial judge had just finished saying that if the speak-o-phone record stood alone and was not explained it would seem to support the theory of the Commonwealth that defendant was attempting to get something in violation of law. But, he went on to say, the defendant claimed he was not guilty of any corrupt solicitation, that he did not start it, that it was started from the other side, and that in going to the Attorney General's office on that occasion he was simply

following up a corrupt solicitation which had been made to him as a senator, and the jury would therefore have to determine whether the two things were connected; that it might be that there had been a corrupt solicitation made to him and other senators which the senators talked about, but that it was not connected with the conference on June 18th. Then followed the excerpt assigned for error. The trial judge at the time was speaking of defendant's intent in *going* to the conference, not of his motive or intent while taking part in the conference. That he covered later. Defendant might have gone to the conference with the intent to draw out Mr. Kalodner as to his proposals on the Ripper bill and changed his mind after he got there, for he never once mentioned it in the course of the conversation which followed. The judge could not properly say that if defendant *went there* because of the previous solicitation, it *must* raise a reasonable doubt and require his acquittal. He was justified in saying that that fact *might* offer such an explanation as would *at least* raise a reasonable doubt, which would enure to his benefit and call, as he had before instructed them, for defendant's acquittal. Later on, in speaking of defendant's actions while in the conference he definitely instructed the jury: "If you find that they [i. e. these corrupt solicitations] were made as a follow up and not as an attempt on his part to get something to which he was not entitled, for some action of his in the case one way or the other, then he should be acquitted, or, if you have any reasonable doubt on that he should be acquitted."

(9) We think there is merit in the assignment (No. 14) which complains of the imposing of a fine of $4000.

The Commonwealth's counsel have stated a number of times, both in their brief and on oral argument, that counts one and two were counts charging "common law extortion". They were drawn without any statement

that the acts charged were "contrary to the form of the Act of the General Assembly in such case made and provided," and closed with the averment, "against the peace and dignity of the Commonwealth of Pennsylvania", as is usual with indictments for common law offenses. But under our Criminal Code the defendant cannot be indicted at common law if there is a statute covering the same offense. Section 183 of the Criminal Code, (Act of March 31, 1860, P. L. 382), provides: "In all cases where a remedy is provided, or duty enjoined, or anything directed to be done by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strictly pursued; and no penalty shall be inflicted, or anything done agreeable to the provisions of the common law in such cases, further than shall be necessary for carrying such act or acts into effect" p. 426.

Section 12 of the same Code provides: "If any justice, clerk, prothonotary, sheriff, coroner, constable or *other officer of this Commonwealth,* shall wilfully and fraudulently receive or take any reward or fee to execute and do his duty and office, but such as is or shall be allowed by some act of assembly of this commonwealth, or shall receive or take, by color of his office, any fee or reward whatever, not, or more than is allowed as aforesaid, he shall be deemed guilty of a misdemeanor in office, and on conviction, be sentenced to pay a fine not exceeding five hundred dollars, or to undergo an imprisonment not exceeding one year." (italics supplied). The defendant was an "officer of this Commonwealth" within the meaning of the section, and if *extortion* was charged it had to be under section 12 of the Code, and not at common law. A charge of common-law extortion was permitted in *Com. v. Saulsbury,* 152 Pa. 554, 25 A. 610, and *Com. v. Channing,* 55 Pa. Superior Ct. 510, because in those cases the defendant was not an officer of the Commonwealth, within the

meaning of section 12 of the Act of March 31, 1860; in
*Com. v. Saulsbury,* he was only a deputy constable ap-
pointed under the Act of May 9, 1889, P. L. 156; in
*Com. v. Channing,* he was a coal and iron policeman
appointed by the Governor, but paid by the coal com-
pany. But this defendant was an officer of the Com-
monwealth within the meaning of section 12 aforesaid
and any indictment for extortion against him, under
color of his office, would have to be made under section
12 of the Criminal Code. If it is claimed that
the counts were drawn as common-law counts be-
cause they charged only *attempted* extortion, and
that there is no section in the code covering *at-
tempted* extortion, then section 183 likewise ap-
plies, and the penalty under a conviction on a
count for attempted common-law extortion, could not
exceed the penalty prescribed by statute for a completed
extortion by the same defendant—in this case, a fine
of $500 or imprisonment not exceeding one year.

The sentence imposed was a fine of $4000. Appellant
suggests that the court had in mind a sentence of $1000
on each count. But it was not so imposed. The court
may not impose a sentence lumping fines any more
than a lumping sentence of imprisonment, in passing
sentence on a defendant convicted on two or more in-
dictments or two or more counts in an indictment: *Com.
ex rel. Holinko v. Ashe,* 290 Pa. 534, 139 A. 197; *Com.
ex rel. Hallett v. McKenty,* 80 Pa. Superior Ct. 249, 250,
251. Where the verdict is a general one of guilty on an
indictment containing two or more counts, and only one
sentence is imposed, it cannot exceed the maximum
penalty which could be imposed under any of the
counts: *Com. ex rel. Holinko v. Ashe,* supra; *Com. ex
rel. Biscetti v. Leslie,* 290 Pa. 530, 139 A. 195; *Com.
ex rel. Russo v. Ashe,* 293 Pa. 322, 142 A. 317; *Halder-
man's Petition,* 276 Pa. 1, 119 A. 735; *Com. v. Schoen-
leber & Patterson,* 96 Pa. Superior Ct. 76, 85. In the

present case the highest fine that could be imposed under any of the four counts was $1000 for bribery.

The Commonwealth's officers frankly admit that under the decisions of this court and the Supreme Court in *Com. v. Ernesto,* 93 Pa. Superior Ct. 339, 347, 348; *Com. v. Veley,* 63 Pa. Superior Ct. 489; *Com. v. Camwell,* 89 Pa. Superior Ct. 339; *Com. v. Baker,* 115 Pa. Superior Ct. 183, 188, 175 A. 438; *Com. v. Berman,* 119 Pa. Superior Ct. 315, 333, 181 A. 244; *Com. v. McCord,* 116 Pa. Superior Ct. 480, 489, 176 A. 834; *Johnston v. Com.,* 85 Pa. 54; *Com. ex rel. Ciampoli v. Heston,* 292 Pa. 501, 141 A. 287; *Com. ex rel. Russo v. Ashe,* supra, separate sentences could have been imposed on only two counts,—(See *Com. v. Birdsall,* 69 Pa. 482; *Halderman's Petition,* 276 Pa. 1, 119 A. 735)—for the same facts which constituted the bribery covered by counts three and four also constituted attempted extortion covered by counts one and two. They claim, however, that as counts one and two were common-law counts, there was no limit to the fine which might be imposed on either of them, provided it was not excessive nor cruel within the constitutional provision, (Art. I, sec. 13), and that this justified a sentence of $4000 fine on one of the first two counts. But as we have already seen, Section 183 of the Act of 1860 forbids such an anomaly as a maximum fine of $500 for a completed act of extortion and a fine of $4000 imposed on the very same person, if the extortion is not completed. We need not discuss the question whether the court could have imposed sentence on each of two or more of the counts. It did not do so. It did not impose a fine on any particular count, and it could not impose one fine aggregating what it might have imposed on the counts separately.

Section 29 of Art. III of the Constitution provides, inter alia, that any member of the General Assembly who shall solicit, demand, receive or consent to receive,

directly or indirectly, for himself or for another, any money, office, appointment, employment, reward, thing of value or enjoyment or of personal advantage, or the promise thereof, for his vote or influence etc., shall be held guilty of bribery and shall incur the disabilities provided in the Constitution for said offense, (See Art. II, sec. 7), and such additional punishment as is or shall be provided by law. Section 48 of the Criminal Code covers *bribery* and applies to the offenses enumerated and declared in sections 29 and 30 of Art. III of the Constitution, which needed no further enforcing statute, such as was necessary to put into effect section 31 of Art. III, relating to the corrupt solicitation of members of the General Assembly and other public officers. See Act of April 29, 1874, P. L. 115; *Com. v. Richardson,* 42 Pa. Superior Ct. 337, 341, affirmed on the opinion of President Judge RICE in 229 Pa. 609, p. 611, 79 A. 222. The limit of sentence which may be imposed on a member of the General Assembly guilty of bribery is a fine not exceeding one thousand dollars and imprisonment by separate or solitary confinement at labor, not exceeding five years. As the court imposed no sentence of imprisonment and did not sentence the defendant upon separate counts, it follows that the fine imposed could not exceed one thousand dollars.

The fourteenth assignment of error, affecting only the sentence, is sustained. All the others are overruled. The sentence of the Court of Quarter Sessions is reversed and set aside and the record is remitted to the said court with directions to proceed to sentence the defendant anew in due form and according to law.