# WILLIAMS v. STATE.

No. A-11225.   Jan. 17, 1951.

(226 P. 2d 989.)

E. William Brown, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Henry Waldo Williams, was charged by an information filed in the district court of Oklahoma county with the crime of rape in the first degree allegedly committed upon Mildred Lawson, an eight year old girl in Oklahoma City.

Pursuant to the verdict of the jury the defendant was sentenced to serve a term of life imprisonment in the State Penitentiary, and has appealed.

The evidence of the state established that Mr. and Mrs. Lewis Lawson lived in a small three room house at 736 S. E. 6th street in the Walnut Grove Addition to Oklahoma City.   About 9:00 p. m. on the night of July 27, 1948, Mrs. Lawson put her eight year old daughter, Mildred, and a younger daughter to bed.   The parents were sleeping in another room.   There were no screens on the doors.   It was warm weather and the windows and doors were left open.   About 2:30 a. m. on July 28th the youngest child complained of the mosquitoes bothering

her and the mother arose to investigate. The eight year old daughter, Mildred, was missing. The police were notified and just as the police arrived at the home a taxicab driver also arrived with the missing girl. He had picked her up on the street about three blocks from her home. She was dressed in her pajamas and was crying. The girl was taken immediately to the Mercy Hospital. The physician who examined her there at that time testified that she found a small amount of blood and grass in the vulva and some bleeding; that the following day she took a smear for gonorrhea and found that the little girl was infected with gonorrhea. She was unable to get a positive indication of gonorrhea at the time of the first examination. The hymen had not been penetrated but there had been penetration in the external part of the vagina as evidenced by the bleeding.

The defendant was arrested and in a line-up at the police station the young girl picked him out from a group of prisoners as being the man who attacked her. The defendant was infected with gonorrhea. On August 2nd he related a detailed confession to the police officers, which confession was taken on a wire recorder and at the same time was taken in shorthand by a stenographer who later transcribed her shorthand notes.

Mildred Lawson, the young girl who was assaulted, testified concerning the assault and identified the defendant as her assailant. She testified that defendant made her take off her clothes and laid her on the ground and told her if she said anything, screamed or anything, he would kill her; that after he laid her on the ground he got on top of her and did something nasty.

The defendant testified in his own behalf and denied raping the little girl. He admitted signing the typed

confession but contended that it was given under undue influence by reason of representations made by certain policemen that if he did make the confession and plead guilty he would be given a suspended sentence, the same as he had been given in connection with the alleged theft of an automobile several months before that date. The defense was in the nature of an alibi. The defendant contended that he was at the home of Mrs. Odessa Mayfield, who was not his wife but a woman with whom he had been living for several weeks.

Odessa Mayfield testified in behalf of the defendant. She stated that she had been living with defendant since the death of her husband; that defendant had been separated from his wife for a year and a half and had been buying her groceries during that period of time; that defendant came in about 12:30 or 1:00 o'clock the night of the alleged rape and that she got up from her bed and fixed supper for him. On cross-examination she admitted that the first time she talked to the officers she told them that the defendant had arrived at her place about 10:00 p. m. Her home was at 937 S. E. 5th street. To refute her statements the police officers testified that Mrs. Mayfield told them that she did not know just what time the defendant came to her home on the night in question.

Robert Lee Jones testified on behalf of defendant that he was a cell mate of defendant during a part of the time he was in the police jail; that defendant was taken out of the cell two or three times during the night; that on one occasion he saw an officer strike defendant. He further stated that he was present along with the defendant and three other Negroes when the little girl picked the defendant from the line-up as the man who had assaulted her.

The principal question presented is whether the court erred in admitting the alleged confession of the defendant in evidence over the objection of defendant. This assignment is divided into two parts. First, the confession was inadmissible for the reason it was obtained by reason of coercion and the promise of benefit to the accused. Second, the confession as taken on the wire recorder was inadmissible.

At the time the evidence pertaining to the alleged confession was first sought to be introduced an objection was interposed on behalf of the defendant. The trial court followed the correct procedure by immediately, in the absence of the jury, hearing all of the evidence for and against the admissibility of the same, including all of the facts and circumstances under which it was allegedly made. At the conclusion of the hearing the court decided as a matter of law that the confession was admissible in evidence but later in the presence of the jury permitted the state and defendant to present all of the facts and circumstances surrounding the giving of the confession to the jury. When the case was finally submitted to the jury the court gave detailed instructions properly defining the issue on the question of the voluntariness of the confession to the jury and advising them that if they should find the confession had not been freely and voluntarily given they should disregard the same. Wood v. State, 72 Okla. Cr. 364, 116 P. 2d 728; Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, 140 P. 2d 248; Id., 322 U. S. 596, 64 S. Ct. 1209, 88 L. Ed. 1481.

There was a variance in the testimony of the police officers, the stenographer who was present at the time the confession was made, and the testimony of the defendant concerning the making of the confession. The defendant testified that the officers continually put the

words in his mouth and told him what to say and that he would not have said the words attributed to him had it not been for the promise of a suspended sentence. To the contrary, the officers testified that the defendant freely detailed all of his activities on the night of the alleged assault and traced his whereabouts from the time he left the filling station where he worked at about 7:00 o'clock p. m. until after he had committed the assault upon Mildred Lawson. The typed confession covered four pages and each page was signed by the accused together with the initials of the subscribing witnesses, who were five in number. The defendant's testimony concerning the coercion and other motivating influences which he contended prompted the giving of the confession was materially weakened by admissions he made on cross-examination. The court properly submitted the question to the jury but there was very little if any factual basis which would have supported a finding by the jury that the confession was involuntarily made. The confession itself shows on its face that the officers did not suggest the answers. A part of the confession reads as follows:

"Q. Well, from the time you left the beer garden and the Two Sisters place about 1:30. Tell in your own words where you went and what you done. A. Well, when I left the Two Sisters Cafe I went back as far as the alley with these girls and boys I was with and there was a horse back there and after this we left there after I stopped there where that horse was. Then next I was over on—I went over on what—over on 6th street. Q. On Byers? A. I was going down Byers and I went across there to 6th street and went up 6th and went in this open door and this girl was laying on the bed inside the door and I picked her up and came out and went on down 6th street to Phillips and down Phillips to 5th and across by the church house and on out to 4th and I went on 4th to this center and we went right east of the center out

there in the road and I told her to pull her clothes down and then I told her to lay down and then I got on her and tried to put it in and after I couldn't I got up and told her to go home and she didn't know the way home and I told her to go down 4th and I went down this little lane to High and turned around and went up High to 5th and then on to 937 where I was staying at. Q. Well now, Henry, did you know what room this little girl was in? A. The front room. Q. Which way was her head facing, east or west? A.West. Q. Was there anyone else in bed with her do you know? A. No, sir. Q. You don't remember anyone else being in the bed with her? A. No, sir, there wasn't. Q. Where did she wake up at. Was she asleep when you got her out of bed? A. Yes. Q. Where did she wake up at? A. On 4th. Q. 4th and Phillips? A. No, sir, on 4th after we came across from 5th. Q. Was there any building there or any certain thing you can place it by? A. Yes, sir, it was there in front of that little store. * * * Q. Do you know how the little girl was dressed when you took her out of the bed? A. Yes. She had on a pair of pajamas. Q. Well, now, did you have her pull these pajamas off? A. Yes, sir. Q. Did she have any other clothes on or do you remember? A. She had an underskirt on. Q. Do you know whether it was over these pajamas or under or what? A. No sir, I don't. I didn't notice that until she pulled these pajamas off."

The above excerpts from the confession will show that the defendant gave the officers information concerning the crime which could not have been furnished them by any person other than one who was present at the time the crime was committed. It is comparable in many ways to the confession admitted in evidence in Lyons v. State, supra.

The question as to the admissibility of the wire recording is a novel one. It is the first time such a question has ever been presented to this court and insofar as our research discloses an identical question has never

been considered by the court of last resort of any other state. There is an extended annotation set forth in 168 A.L.R. 927 pertaining to sound recordings as evidence but the cases therein discussed did not any of them purport to involve an identical wire recording device as here presented. However, we think the reasoning of the courts in some of those cases would likewise apply to the wire recording herein involved.

According to the evidence before us, the wire recording was taken upon a thin wire by mechanical or electrical means. The original recording on a spool was filed with the record on appeal and we have inspected it. Such wire purports to record the sounds of the human voice which are picked up by a microphone and transferred to the wire. The wire is fragile. It can be easily broken and tied together. It can be stopped and played back at will. The wire can be erased and used again. It is the contention of counsel for defendant that the recording wire is so fragile, breakable and perishable that the court should not have admitted it in evidence.

It is true that most of the cases involving sound recordings as evidence involve various types of discs used to reproduce the sound of the human voice. State v. Perkins, 355 Mo. 851, 198 S. W. 2d 704, 708, 168 A.L.R. 920. In that case the Supreme Court of Missouri held that phonographic recording of a confession made by the defendant held on suspicion for rape was admissible in evidence against him when a proper foundation is laid by the person with respect to the use of this method of reproducing the voice of the accused. In the body of the opinion the court stated:

"The principle involved is the same as that in relation of the admissibility of talking motion pictures. In

People v. Hayes, 21 Cal. App. 2d 320, 71 P. 2d 321, 322, a sound motion picture of the defendant making a confession to the police was reproduced to the jury over the objection that the reception of such evidence was prejudicially erroneous to the defendant and this was the single point in the case. In upholding the conviction, the court said that such reproduction 'Stands on the same basis as the presentation in court of a confession through any orthodox mechanical medium, that is, there is a preliminary question to be determined by the trial judge as to whether or not the sound moving picture is an accurate reproduction of that which it is alleged occurred. If after a preliminary examination, the trial judge is satisfied that the sound moving picture reproduces accurately that which has been said and done, and the other requirements relative to the admissibility of a confession are present, i. e., it was freely and voluntarily made without hope of immunity or promise of reward, then, not only should the preliminary foundation and the sound moving picture go to the jury, but, in keeping with the policy of the courts to avail themselves of each and every aid of science for the purpose of ascertaining the truth, such practice is to be commended as of inestimable value to triers of fact in reaching accurate conclusions.

" 'This particular case well illustrates the advantage to be gained by courts' utilizing modern methods of science in ascertaining facts. The objection is frequently heard in criminal trials that a defendant's confession has not been freely and voluntarily made, he testifying that it was induced either by threats or force or under the hope or promise of immunity or reward, which is denied by witnesses on behalf of the People. When a confession is presented by means of a movietone the trial court is enabled to determine more accurately the truth or falsity of such claims and rule accordingly.' "

In the Pennsylvania case of Commonwealth v. Clark, 123 Pa. Super. 277, 187 A. 237, 240, it was stated:

"The phonograph, the dictaphone, the talking motion picture machine, and similar recording devices, with reproducing apparatus, are now in such common use that the verity of their recording and reproducing sounds, including those made by the human voice in conversation, is well established; and as advances in such matters of scientific research and discovery are made and generally adopted, the courts will be permitted to make use of them by way of presenting evidentiary facts to the jury."

It is our conclusion after fully considering this question that the rules determining the admissibility of a confession taken on a phonographic record or on a wire such as in the instant case or a disc are to be determined by the same rules as govern the taking of a confession by shorthand, which is later transcribed. That is, the party offering the wire recording in evidence must make a showing with reference to its preparation, that is, whether the mechanical device was sufficiently capable of taking the confession; and also there should be a proper showing as to the manner of the preservation of the wire recording, that is, as to whether any changes have been made, deletions, or additions to the recording, and of the correctness. The genuineness or the authenticity of the recording must be established. The contention of counsel that the recording should have been rejected because the evidence disclosed that the wire may be erased or otherwise changed likewise applies to a confession which is taken by a court reporter in shorthand and later transcribed. The rules as to the authenticity or genuineness of the confession are the same. If the party objecting to the confession can make a showing that it has been erased or deleted or changed in any manner the court would sustain an objection to its admissibility. The wire recorder which reproduces the actual voice of the accused and those who

may be questioning him should be of much more value to the court and the jury than a confession taken in shorthand and later reduced to writing, especially where an issue has been raised as to whether the confession was voluntarily made.

Although counsel in his brief does not have the point specifically stated, it appears that he is raising the question as to the admissibility of the testimony of Doctor C. B. Taylor, who was the head of the Oklahoma City Venereal Clinic, concerning treatments made of defendant at the clinic. One of these examinations was made on August 3, 1948, while defendant was in custody, which was five days after the alleged crime was committed. At that time the results of the examination were negative, that is, it failed to show that defendant was infected with gonorrhea. However, the doctor further testified that his record showed that the defendant had been to the clinic July 30, 1948, at which time an examination showed he was infected with gonorrhea. The doctor further stated that at that time defendant was given three hundred thousand units of penicillin, and that ordinarily such a dose of penicillin will cure gonorrhea within twenty-four hours.

The evidence of the state showed that as a result of the assault made upon Mildred Lawson she became infected with gonorrhea. The question as to whether the accused at the time of the attack was afflicted with such ailment was very material. In the voluntary statement made by the defendant he related that he had had the gonorrhea, "off and on for two months. It has been running but most of the time it has been negative, although it continued to run."

In his testimony he denied that he was afflicted with gonorrhea at the time of the alleged attack. When Doctor Taylor was called as a rebuttal witness by the state, counsel for the accused did not object to his testimony that on August 3, 1948, his examination for gonorrhea was negative, but when he attempted to testify concerning the entry on his record on July 30, 1948, the objection was made because of the alleged privileged relationship between the Doctor and the defendant.

In the case of Hudman v. State, 89 Okla. Cr. 160, 205 P. 2d 1175, it is stated:

"A person may waive the privilege of objecting to the testimony of a physician, who makes a personal examination of such person, as to the results of such examination. Tit. 12 O.S. 1941, § 385."

In the body of the opinion we quoted with approval from the case of Roeser v. Pease, 37 Okla. 222, 131 P. 534, wherein it is stated:

"The theory upon which the privilege is based is that a person is entitled to have his physical disabilities protected from public curiosity. If, however, he goes into a court of justice and bases an action upon the existence of a physical disability, and testifies himself as to its existence or nonexistence, he, of course, is not entitled longer to claim a privilege for his condition, and the statute does not contemplate protecting him in such case. An interesting discussion of the subject is contained in the fourth volume of Wigmore on Evidence, § 2380, et seq."

It is our opinion that when the accused testified concerning his alleged physical condition denying he had the gonorrhea at the time of the alleged assault and then permitted the Doctor to testify concerning the examination that was made on August 3, 1948, he waived the privilege of objecting to the testimony of the physician

concerning the examination and treatment on July 30, 1948. The defendant by his testimony opened up the field and cannot object to the physician relating the result of the examination which he had made. In other words, he may not seek to get before the jury that part of the Doctor's evidence which was favorable and then object to another part which was unfavorable which pertained to the same subject matter.

In making his statement of the case at the commencement of his brief counsel for defendant refers to the fact that defendant had been tried on the 14th day of September, 1948, and convicted, but that a motion for new trial was sustained and the case reset for trial on October 20, 1948; that at the time the case was called for trial in October defendant objected to going to trial for the reason that some of the jurors on the panel which were to try him had been on the panel at the time he was previously tried. This contention is not set up as an assignment of error but because this is a capital case where the defendant was given a sentence of life imprisonment we have carefully considered the record to see whether the defendant was deprived of his substantial rights in the selection of a jury.

In the case of Rawls v. State, 93 Okla. Cr. 219, 226 P. 2d 984, this court said:

"The burden is upon the defendant who presents challenge to jury panel to make a proper showing by introducing evidence to sustain his challenge.

"The prejudice of individual jurors against accused is no ground for a challenge to the entire panel but should be raised by challenging for cause the alleged prejudiced jurors individually."

An examination of the record discloses that the court was very careful in the selection of the jury and on his

own motion dismissed several jurors who indicated in their voir dire examination that they had read of the case or heard the case discussed. All of the voir dire examination of the jurors is set forth in the record. Counsel for the defendant was evidently satisfied with the jury which he had selected because he only used three of his nine peremptory challenges. At the time he accepted the jury he had six peremptory challenges left. The court had been liberal in allowing an extensive examination of the prospective jurors and if there had been anything in this examination to indicate to counsel that any of the jurors were biased or prejudiced against his client he had ample opportunity to eliminate the prospective jurors by peremptory challenges.

Complaint is also made concerning the closing arguments of the assistant county attorneys who prosecuted the defendant. All of the argument of one of the prosecutors is included in the record. Without a doubt such argument contains very forceful and vivid language describing the activities of the accused. Some of the expressions to which objection was made are the following: "Defendant was under the record the vilest type of character known to humanity." (He has) "a warped brain, a degenerate mind." (He) "should be killed just as a person would kill a rattlesnake".

The court sustained some of the objections interposed to the argument of the prosecutor and, whether sustaining or overruling the objection interposed to the argument, the court would admonish the jury that counsel had a right to make his reasonable deductions from the evidence but that arguments of counsel were not evidence in the case and should not be considered if they

were outside of the record or not sustained by the evidence. The prosecutor further referred to the accused as being, "lowdown, degenerate, and filthy".

Courts are very liberal in allowing attorneys to present their views in their arguments to the jury and it is only when they purposely go outside of the record for the purpose of exciting the passion and prejudice of the jury so as to cause them to act in a biased manner will the courts interfere so as to set aside the verdict. As hereinabove stated the language used by the prosecutor was very forceful, but we cannot say that it was wholly unsupported by the record. In fact, we think the record completely supports the references made to the accused. His guilt is completely shown. We agree with the prosecutor that an adult who would commit the acts done by the defendant shows that he is, "lowdown, degenerate, and filthy". He richly deserves the punishment which he received.

The judgment and sentence of the district court of Oklahoma county is affirmed.

BRETT, P. J., and POWELL, J., concur.