Robert L. TICE, Plaintiff in Error,

v.

The STATE of Oklahoma, Defend-
ant in Error.

No. A–15483.

Court of Criminal Appeals of Oklahoma.

Oct. 14, 1970.

Rehearing Denied Jan. 13, 1971.

Rick Chew, Doyle C. Scott, Scott, Groom & Woody, Oklahoma City, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Jack Pratt, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

Lt. Robert L. Tice, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Comanche County for the crime of First Degree Rape; he was sentenced to serve five years in the state penitentiary, and appeals.

The record reveals that Mrs. June Stacy, the prosecutrix, had known defendant for approximately two years and that she had approximately six to twelve social meetings with Lt. Tice and his wife. Mrs. Stacy testified that on December 11, 1968, her husband was in Viet Nam and that she was approximately nine months pregnant. She further testified that on the night in question that her assailant entered her home, approached her, grabbed her right wrist with his left hand and put his right hand over her mouth and said, "If you scream I will kill you." Upon being confronted by her assailant, she testified that the name Robert Tice flashed through her mind and when she heard his voice it became even more apparent to her because she recognized his voice. When her assailant left her room, she went to the win-

dow in her daughter's bedroom, and recognized a cream colored, or light Ford, travelling in a southerly direction, as looking exactly like the car that Lt. Tice owned.

Dr. Epstein's testimony disclosed that on the morning of December 11, 1968, he examined Mrs. Stacy and his examination disclosed that she had had sexual intercourse within 24 hours of the examination which he performed.

Investigating officers testified that two screens from windows were laying in the backyard and a scuff mark was found on the entrance of the window sill to the daughter's bedroom.

The only testimony presented for defendant was that of his wife who testified that he arrived home on December 11th, some time prior to 4:05 a.m., when she fixed him some breakfast. Lt. Col. Grigsby testified as to the general reputation for truth and veracity of Lt. Tice.

Mrs. Stacy was recalled and testified that Mrs. Tice came to her home on Thursday, following the incident, at which time Mrs. Stacy asked Mrs. Tice if she knew what time her husband had arrived home on December 11th, and Mrs. Tice stated that she did not know.

Since two of the three propositions of the defendant relate to the hearing on the Motion to Suppress the defendant's confession, we deem it necessary to set forth a summary of the testimony offered outside the presence of the jury; the judge's ruling thereon; and action taken in the presence of the jury relating to this issue.

Fred Mitchell, a Detective with the Lawton City Police Department, first testified that he saw the defendant on the 11th day of December, 1968, between 4:30 and 5:00 p.m., when he arrived at the police station, at which time Detective Britt and Major Stout were present with him. He testified that Detective Britt told the defendant they needed to talk to him in regard to a rape case that had been reported to the department in the early morning hours of that same day, and that he had been mentioned as a suspect in the case by the complainant, Mrs. Stacy. He further stated that the defendant was advised "that he had a right to call an attorney, and he didn't have to answer any questions, and any questions that he answered could be used against him, and we have a form that we—which is a rights waiver form—which we gave to him and he read this rights waiver. I explained to him, sort of, what it was. I told him it was similar, same thing as Article Thirty-One, and he said, yes, he was familiar with Article Thirty-One, that he had done the same thing as we were doing to boys out at the post, advise them of their rights, and he understood what it was, and he signed this rights waiver." (CM 52 & 53).

Detective Mitchell further stated that after signing the waiver, the defendant was interrogated for perhaps thirty minutes and that he stated that he did go into Mrs. Stacy's home and rape her on the morning in question. Detective Mitchell then advised the defendant that they would reduce his statement to a typewritten one which he could look over before he signed the same; however, the defendant stated that he would prefer to write the statement in his own handwriting, and he was then furnished pen and paper with which to do so. The defendant was left alone while he wrote the statement and Detective Mitchell stated that he did not request that an attorney be present; his answers appeared to be quite coherent and no promises of reward or immunity were offered to the defendant before the statement was taken. Defendant signed the statement in Detective Mitchell's presence.[1]

On re-direct Detective Mitchell testified that the defendant told Officer Britt where the screwdriver was located in the car and Detective Britt brought the screwdriver

---

1. The statement contained deletions and corrections, all of which were initialed by the defendant.

into the police station and Lt. Tice identified it.

Lt. Tice testified that he received a call from Detective Britt to come to the police station; that when he got there he was told that June Stacy had accused him of raping her; that he replied that he had not; that the detectives gave him a waiver form and a pen and stated, "now, this is a waiver for your rights, and you can have a lawyer with you when you talk to us," and defendant then signed the waiver. Defendant further stated that he was interrogated some fifteen minutes before the waiver was presented to him and that he requested to see Mrs. Stacy. Defendant stated that he asked Major Stout that if he would write the statement would they call June and get her down to talk to him and that Major Stout answered, "Yes." Defendant further stated that this was the only promise made to him; that no force was used upon him.

Thereafter, the attorney for defendant stated his opinion as to the *Miranda* decision to the Judge and the prosecutor replied thereto. The Court then made the following statement:

"Gentlemen, I have followed the evidence very carefully in the case. I am very familiar with the Miranda decision. If you took the Defendant's testimony alone it is possible that it might come within that but taking the officer's testimony·plus his, the court is impelled in this case to submit this question to the jury as to whether or not, because there is a big divergence of opinion here, statement, as to what happened, and I don't think there is any question but what the Miranda decision at least might apply just on the Defendant's statement alone, but with the statement of the officer, it forms an issue in my judgment as to whether that case would apply, and the court will have to submit it to the jury, so I will overrule the objection." [Exception allowed.]

▮▮▮ Although the defendant argues his first proposition under four subdivisions, and the State answered under four, the crux of these arguments poses the question of whether the hearing and judge's ruling were in accordance with the requirements of Jackson v. Denno, 378 U. S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

In *Jackson,* supra, we find the following pertinent language in Footnote 8, referring to the Massachusetts rule, which has long been followed by the courts of this state:[2]

"We raise no question here concerning the Massachusetts procedure. In jurisdictions following this rule, the judge hears the confession evidence, himself resolves evidentiary conflicts and gives his own answer to the coercion issue, rejecting confessions he deems involuntary and admitting only those he believes voluntary. It is only the latter confessions that are heard by the jury, which may then, under this procedure, disagree with the judge, find the confession involuntary and ignore it. Given the integrity of the preliminary proceedings before the judge, the Massachusetts procedure does not, in our opinion, pose hazards to the rights of a defendant. While no more will be known about the views of the jury than under the New York rule, the jury does not hear all confessions where there is a fair question of voluntariness, but only those which a judge

---

2. Williams v. State, 93 Okl.Cr. 260, 226 P.2d 989 (1951); Lyons v. State, 77 Okl. Cr. 197, 138 P.2d 142 (1943); Wood v. State, 72 Okl.Cr. 364, 116 P.2d 728 (1941); Brewer v. State, Okl.Cr., 414 P.2d 559 (1966). In Brewer v. State, supra, in paragraph number 6 of the Syllabus, we find the following language:
"Where the question arises as whether a confession is voluntary or involuntary, the correct procedure is for the court to immediately withdraw the jury and hear all the evidence both for and against the competency of the same, and all the facts and circumstances under which the same was made, and decide whether the confession was voluntary or involuntary. If voluntary, it may be presented, together with all the facts and circumstances surrounding the giving of the same to the jury. If involuntary, it is inadmissible."

actually and independently determines to be voluntary, based upon all of the evidence. The judge's consideration of voluntariness is carried out separate and aside from issues of the reliability of the confession and the guilt or innocence of the accused and without regard to the fact the issue may again be raised before the jury if decided against the defendant. The record will show the judge's conclusions in this regard and his findings upon the underlying facts may be express or *ascertainable from the record.* [Emphasis added].

Once the confession is properly found to be voluntary by the judge, reconsideration of this issue by the jury does not, of course, improperly affect the jury's determination of the credibility of probativeness of the confession or its ultimate determination of guilt or innocence.[3]

■ In the instant case a hearing was conducted outside the presence of the jury at which conflicting evidence was offered and while the trial court did not set forth his ruling as to the voluntary nature of the confession in precise language, it is readily apparent in overruling the Motion to Suppress that he considered the confession voluntary and admissible and as such was a proper matter for the jury's consideration under the prior decisions of this Court. See Brewer v. State, Okl.Cr., 414 P.2d 559.

It is next contended that the defendant had not been thoroughly advised of his constitutional rights in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and that the confession was involuntary in that his interrogators had promised, prior to his confession, that he could see and talk with the victim, and for these reasons the confession was *improperly admitted.* We believe this contention is amply refuted by the brief filed on behalf of the Attorney General, which we adopt, in part, with approval.

It appears from the record no less than seven times that Detective Mitchell testified that *before* the defendant was interrogated, he was advised of his constitutional rights. The State contends this is ample evidence to support the findings that defendant was not interrogated prior to his being apprised of his rights.

■ Appellant contends that the defendant was inadequately advised by Detective Mitchell of his rights during the interrogation. The record discloses, however, that the following rights were orally explained to the defendant, by Detective Mitchell. That the defendant had a right to call an attorney (T 52, 60, 87, 101); that the defendant did not have to answer any questions (T 52); that any questions the defendant answered could be used against him (T 52, 60, 87, 101). The record further discloses that the defendant was given a rights waiver form (T 52); that Mitchell explained to defendant that the form was similar or the same as Article 31 (referring to military law) (T 52, 53); that defendant communicated to Mitchell that he understood the rights waiver form (T 53, 87); and that defendant read and signed the rights waiver form (T 87, 102). The record further discloses that the defendant was a high school graduate, that he had completed one year of college education, and that he was an officer in the U. S. Army (T 72, 73).

The record also shows that the rights waiver form was introduced into evidence as State's Exhibit #2, the body of which is as follows:

"Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during the questioning. You have the right to the advice and presence of a lawyer even if you cannot afford to hire one. A

---

3. The rule enunciated in Jackson v. Denno was reiterated in Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593.

lawyer will be appointed for you, if you wish it. If you wish to answer questions now, without a lawyer present, you have the right to stop answering at any time until you talk to a lawyer."

### WAIVER

"I have read the statement of my rights as shown above. I understand what my rights are. I am willing to answer questions, and to make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me * * *"

The above quoted rights waiver form, taken with Mitchell's oral explanation to defendant of his rights, amount to an adequate apprisal of defendant's rights as required by Miranda v. Arizona, supra. In *Miranda*, the United States Supreme Court spelled out that a defendant must be apprized of the following rights; 1. that he has a right to remain silent: 2. that any statement he does make may be used as evidence against him; 3. that he has a right to the presence of an attorney either retained or appointed; and 4. that if he cannot afford an attorney one will be appointed for him prior to any questioning, if he so desires.

■ It is well settled that "the 'words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective' and that 'words which convey the substance of the warning along with the required information are sufficient.'" United States v. Fox, 403 F.2d 97, 100 (2d Cir.1968); United States v. Vanterpool, 394 F.2d 697 (2d Cir.1968). See also Peterson v. State, Okl.Cir., 473 P.2d 293. There is nothing said in *Miranda* itself that " * * * there must be slavish adherence *in haec verba* to the formula suggested therein." United States v. Fox, 403 F.2d at 104 (Moore, J., dissenting).

■ We are of the opinion that there is amply evidence in the record to support the findings that no promises were made to the defendant whatsoever. Detective Mitchell testified on direct examination before the court and the jury as follows:

"Q. Were any promises made to him at any respect by you or any other officer down there?

A. No, there was not.

Q. Did you use any coercive tactics of any kind?

A. Did not." (T 89)

Mitchell further testified on cross-examination as follows:

"Q. Did you promise Lt. Tice anything?

A. No, I did not." (T 96).

Upon further cross-examination, Mitchell testified as follows:

"Q. Then you did promise him something?

A. No, I didn't promise him anything.

Q. You promised him you would get in touch with her didn't you?

A. I told him I would. I didn't promise him I would.

Q. What does a promise mean to you?

A. What does what?

Q. If you tell me you will do something, isn't that a promise you will do something?

A. I just told him that I would. I didn't say I promise you I will." (T 97)

Mitchell also testified during the hearing on voluntariness as follows:

"Q. All right. Now, Mr. Mitchell, did he request that he be given permission or that you contact Mrs. Stacy so that he could talk to her?

A. He asked me—this was after the statement, right after he had

signed the statement he asked, he said, wonder if I could see Mrs. Stacy.

Q. Are you sure this was after the statement?

A. Yes, I am sure it was. He might have now—this was, I believe after the statement because I told him I would call her and see if she wanted to talk to him. I had him to wait right there.

Q. Did you?

A. Yes, I went and called her—went into the other office and called her and she said she would rather not talk to him." (T 58)

In Miller v. State, 13 Okl.Cr. 176, 163 P. 131, it was held that a confession *induced* by promises which hold out hope of benefit or reward is not a voluntary confession and inadmissible. From the above quoted testimony it is clear that the request by defendant to see the victim, Mrs. Stacy, was made *after* defendant had written his confession statement. Thus, even if Mitchell's statement that he would go call the victim and see if she wanted to talk to defendant were to be construed as a promise, the fact that it was made subsequent to defendant's confession statement plainly refutes any contention that the so-called promise induced the confession.

Lastly, it should be pointed out that the waiver of rights (Exhibit 2, T 171) which Mitchell testified was read, signed, and understood by the defendant, contains the following statement: "No promises or threats have been made to me and no pressure of any kind has been used against me."

The defendant contends that the officers who interrogated the defendant substantially dictated defendant's confession. This contention is not supported by the record. The defendant, at his own request, was allowed to write the confession in his own handwriting; and further, the defendant wrote the confession while alone in the interrogation room.

The confession itself indicates that it was not dictated by the Lawton police officers or anyone else. A reading of the confession discloses that the defendant wrote the time of day and date in military terms, i.e., 0415 11 Dec. 68 (T 170). This was obviously not dictated to defendant by the police officers. Furthermore, the confession discloses the following statements:

"I don't know why I did it. When I saw her I didn't want to hurt her. I was confused and afraid. I didn't know what to do. I don't even know why I entered her house. It was just on impulse. Lately I have been so bored and upset over nothing. I have been very frustrated lately and her appearance completely stunned me. I do not really recall any conscious thought after stopping the car near her house * * *. I am very sorry this happened." (T 170).

It is obvious that such language was not dictated by the police officers, but was originated by, and was the product of, the free will of defendant.

We are of the opinion that the confession was freely and voluntarily made by the accused, after having been advised of his rights under Miranda v. Arizona, supra, and that this assignment of error is without merit.

The defendant lastly contends that the evidence independent of the confession was insufficient to support the verdict of the jury. Having determined that the trial court did not err in admitting the confession, it is unnecessary to consider this assignment of error; suffice it to say, that the competent evidence adduced on the trial, including the confession, amply supports the verdict of the jury.

For all of the reasons above set forth, the judgment and sentence appealed from is affirmed.

BRETT, P. J., and NIX, J., concur.