## J. C. EVANS v. STATE.

No. A-494. Opinion Filed May 2, 1911.

1. WITNESSES—Privileged Communications to Attorneys. The statute which provides that an attorney shall not be compelled to testify "concerning any communication made 'to him by his client, in that relation or his advice thereon without the client's consent," is but declaratory of the common law, and should be fairly construed and applied according to the plain import of its terms; the statute is for the benefit of the client, not the attorney.

2. SAME. An attorney is employed in his professional capacity when he is voluntarily listening to a client's preliminary statement. It is not necessary that any retainer should have been promised, paid, charged, or demanded, and it makes no difference even though the services are gratuitous.

(Syllabus by the Court.)

*Appeal from District Court, Blaine County; G. A. Brown, Judge.*

J. C. Evans was convicted of forgery and appeals. Affirmed.

*J. W. Johnson* and *Seymour Foose*, for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty., Gen., for the State.

DOYLE, JUDGE. Plaintiff in error, J. C. Evans, was jointly indicted with P. F. Tyler and W. S. Wishard for the crime of forgery as defined by section 2560, Snyder's Sts., which indictment is set out in the companion case of *W. S. Wishard v. State,* decided at this term (*ante*).

September 29, 1909, the case was called for trial and plaintiff in error demanded a severance, which was allowed, and his trial commenced. October 1st, the jury returned a verdict of guilty and assessed his punishment at imprisonment in the penitentiary for a period of seven years. Motions for a new trial and in arrest of judgment were duly filed. October 7, 1909, said motions were overruled and judgment and sentence was pronounced and entered in accordance with the verdict. Defendant appealed by filing in this court on January 5, 1910, a petition in error with case-made.

The facts are fully stated in the companion case of *Wishard v. State, supra.* The assignments of error present but one new question.

Error is assigned upon the ruling of the court sustaining the motion of the state to exclude the testimony of the witness Ed Baker, and in instructing the jury not to consider the same. It appears from this testimony that he was a practicing attorney at Watonga; that he was acquainted with the Rossiters; that two of the Rossiter boys and their father came to his office and consulted him concerning a criminal case; that about a week after the father and his two sons, Jesse and John, visited his law office. He further testified as follows:

"Q. Did either one of those there in your presence and hearing make the statement in the presence of the others that Elwood Rossiter had signed the names of both the men to that deed, that is, the name of J. M. Rossiter and J. C. Rossiter? A.

They certainly did. Q. Do you remember any other occasion that same fall when some of these Rossiter women were in your office A. Yes, sir; these men were there and there were other conversations, and they were talking of employing me. I said, 'How many witnesses can you prove these alleged facts by?' I said, 'I want to talk to the witnesses myself'; and we made an appointment at that time before that court adjourned that they were to bring the whole family in there, and they did do that; there was one of the girls, I would not swear which one it was, but I knew what she looked like then; I know one or two girls were there, Elwood, the old man, and Jesse, and I think Linn was there; and this same talk was had, and they told me then that Elwood was the man who had signed the deed, and Cora or one of the girls had signed the name of Julia Rossiter to this deed. By Mr. Foose: That is all.

"Cross-Examination.

"By Mr. Boardman:

"Q. When was that? A. I think it was in 1906, but the court records here would show the time it was; it was right immediately following the transaction where Jesse Rossiter was released by order of district court. Q. You had seen some of them previous to that? A. Yes, I had transacted a little business in a legal way for one of them just before that, but this matter I think probably was mentioned. Q. Did they say something about coming in to see you again? A. I would not say whether they did or not, but I think they did. Q. You were a practicing attorney in this county and state at that time? A. Yes, sir. Q. What did they say; what was the first thing any of them said? A. I think the old man done most of the talking that day; as to just what was the first thing said, I don't remember; we were talking about this land deal. Q. This same deed? A. Yes, sir; this deed, and also about the transaction in regard to the old man's place; two different deals were tallked about at that time; about the old man giving a mortgage on his place and about this deed being signed up to Elwood Rossiter. Q. Is it not a fact that these people were in your office at that time seeking counsel? A. Yes, sir. Q. No question about that? A. No question about that, to see what their remedy might be. Q. You were asking these things with a view to getting at the facts? A. Yes, sir. Q. Trying to set aside this deed? A. That was the object of it. Q. They did set the deed aside? A. I think the records show it

was set aside, though I had nothing to do with it; they never employed me in this matter though we counseled about it twice. Q. After you counseled the first time and they stayed in there about an hour, what did you say to them as they left; had you decided as to what their rights were or had you reserved something? A. I know I told them this: They were to come back again soon and were to bring the women; I wanted to talk to all of them and see who all the witnesses were and what they knew about it? Q. What time of year was that, the first visit you speak of? A. I think it was in the fall. Q. Of 1906? A. I think so. Q. How long after that was it that they came in again with some of the women? A. Only two or three days. Q. Did you talk with them again? A. Yes, sir. Q. Go over the same matter? A. Yes, sir. Q. Did you charge them anything for counsel? A. No, sir; we fell out about the fee, and I was not employed, I suppose was the reason; I put my price and they thought it was too high and the matter dropped there. Q. You had got to the point in the conversation where you were going to take the case if they would pay you a certain fee? A. Yes, sir; that was a fact. Q. Did you make any demand for services? A. No, sir; never did. Q. Isn't that a little unusual? A. It might have been, but I didn't know but what they would employ me. I made the fee and they said they would see about it, and they did not, and I never charged anything against them."

Counsel for the state here moved to strike out the testimony and withdraw the same from the consideration of the jury for the reason that the same is incompetent, irrelevant and immaterial in that the communication was privileged—which motion was by the court sustained. Counsel insist that this was error.

Section 5842, Snyder's Sts., Procedure Civil, provides in part as follows:

"The following persons shall be incompetent to testify: * * * 4. An attorney, concerning any communications made to him by his client, in that relation, or his advice thereon, without the client's consent."

Section 6834, Snyder's Sts., Procedure Criminal, provides:

"Except as otherwise provided in chapter on Procedure Criminal and Procedure Criminal Before Justice; the rules of evidence in civil cases are applicable also in criminal cases."

The court correctly decided that the relation of counsel and client existed and that the communication was privileged. Undoubtedly the Rossiters consulted this witness as a lawyer to secure his services. It matters not that no fee was paid, demanded, or charged, or that there was a disagreement as to what fee should be charged. The statute is declaratory of the common law. Communications made to an attorney in connection with or in the course of professional employment are under the seal of confidence and entitled to protection as privileged communications even though the services are gratuitous. The statute is for the benefit of the client, not the attorney, and such communications are permanently protected from disclosure, except where the client waives the protection. Prof. Wigmore says:

"An attorney may often be brought into a discussion upon the law, without any purpose of treating his expression of opinion as a service rendered professionally. Such a conversation is not privileged, because the reason of the privilege designs to secure only the freedom of resort to attorneys where some appreciable interest of the client is to be protected and the advice is sought and given with a view to its protection. On the other hand, an attorney may render his services without charge, if he pleases, and hence the mere circumstance that the advice is given gratuitously does not nullify the privilege. In view of the frequency with which some persons seek to obtain informally and gratuitously valuable legal advice, and the lamentable frequency with which attorneys weakly submit to such an imposition, especially in rural communities, it is often difficult to determine whether the consultation is a professional one, within the privilege. The local habits of life, and the circumstances of the case, must largely determine the ruling. The case of a consultation of the opponent's attorney seems rather to fall under another head (*post,* sec. 2312), as also the case of a consultation by one person not on his own behalf but as the agent of another (*post,* sec. 2317).

"It follows that a communication to an attorney, not in his capacity as such, is without the privilege if made before the relation was entered into or after it was ended. An interesting question, however, arises when the communication is made pending negotiations for the retainer. Here it would seem plain, by the reason of the privilege, that, since the would-be client cannot

certainly predict the attorney's acceptance of the employment, the former must be protected in his preliminary statements when making the overtures, even if the overture is refused. It would further be immaterial that the refusal was due to a disagreement as to fees and to the client's own withdrawal by reason of the fee demanded; for upon none of these matters could he predict the result until his preliminary statement had been made. Obviously, too, if the retainer is accepted, the privilege covers the preliminary statement. On the other hand, if the client continues his communication after the attorney's refusal to act for him, or if the client knowingly attempts to retain one who is already retained by the opponent, he does not need or deserve the protection of the privilege." (Wigmore on Ev., secs. 2303 and 2304.)

Mr. Greenleaf says:

"This protection extends to every communication which the client makes to his legal adviser, for the purpose of professional advice or aid, upon the subject of his rights and liabilities. The great object of the rule seems plainly to require that the entire professional intercourse between client and attorney, whatever it may have consisted in, should be protected by profound secrecy." (Greenleaf on Ev., vol. 1, sec. 240.)

We find no prejudicial error in the record. Upon the whole record it does not appear that any mistake was made in convicting the defendant. The judgment of the district court of Blaine county is therefore affirmed.

FURMAN, PRESIDING JUDGE, and ARMSTRONG, JUDGE, concur.