## HENSON v. STATE.

No. A-11799.   Oct. 7, 1953.

(261 P. 2d 916.)

W. A. Billingsley, A. C. Kidd, and J. W. (Bill) Hutchison, Wewoka, for plaintiff in error.

Mac Q. Williamson, Atty Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, W. H. Henson, was charged by an information filed in the district court of Seminole county with the crime of murder; was tried, convicted of manslaughter in the first degree and, pursuant to the verdict of the jury, was sentenced to serve 20 years imprisonment in the penitentiary, and has appealed.

Timmie McGirt, an Indian, was employed by the Mid-Continent Petroleum Corporation at Cromwell. On June 26, 1951, as he and J. W. Harper, another employee of the oil company, were leaving the plant, the defendant, W. H. Henson, drove up in his automobile, jumped from his car, pointed a shotgun at the deceased and said, "Now is your time" and fired the shotgun at close range, which struck the deceased and knocked him to the ground. Henson then walked around to the north of the body of deceased, ejected the discharged shell and fired a second shot into the body of deceased as he was lying on the ground. Later that evening, the defendant surrendered to the sheriff's office in Wewoka, stating that he had shot the deceased McGirt, and further stating in response to whether he killed McGirt, "I think so, if I didn't I'd still be out there."

At the trial, the defendant interposed a plea of not guilty by reason of temporary insanity, brought on by the knowledge that the deceased and the wife of the defendant had been having illicit sexual relations over a long period of time. The proof showed that the defendant, at the time of the homicide, had an active case of tuberculosis and for several years had periodically been confined in government hospitals for treatment of this disease. The wife of the defendant testfied that the deceased, who was her uncle, had come to her home in Cromwell while the defendant was in the Veteran's hospital at Sulphur, and that although she protested, he had sexual intercourse with her and that thereafter this continued once or twice a week until June 1, 1951. That on the night of June 1, 1951, Annie McGirt, the wife of the deceased and aunt of Mrs. Henson, came to the Henson house and found Timmie McGirt and Mrs. Henson standing on the back porch embracing each other. Mrs. McGirt called the defendant over the telephone and informed him of what she had seen. Later, Mrs. Henson told her husband, the defendant, what she had been transpiring and Henson had a talk with Timmie McGirt in which Henson testified that he told McGirt, "Since you love that woman and them kids like you have and maybe I am going to die, I always thought you was a good man, * * I am going to let you have that woman and kids and take care of them." That McGirt said, "No, Bill, you've got a good wife, I ain't going to do that." That Henson said, "I've got to move and get away from here, you've disgraced my kids and my wife and me, and I've got to go to the hospital," and McGirt said, "We'll move your family to town and I'll give you my word I'll never bother them again in no way." And McGirt further said, "While you're in the hospital. if your wife runs short, if you really need anything, call me and I'll let you have some money until you get out where you can go to work." That Henson replied, "If you'll do that and prove to me you can leave my family alone, I'll never forget it but I'll never bother you in no way."

The evidence of the state showed that about two weeks later the defendant in a conversation with the lawyer for the deceased on Wednesday before the fatal shooting the following Tuesday, made a demand for $2,500 and said he would give the deceased until the following Saturday to pay. The proof of the state further showed that on the date of the homicide the defendant went to a friend, borrowed his shotgun, drove to Seminole and bought some size two shotgun shells. That about noon he drove to the Mid-Continent plant at Cromwell and inquired of the superintendent for McGirt. That about 4:00 p.m. he parked his automobile

near the plant and waited until the employees started emerging from the plant at the end of the day's work at 5:00 p.m. That the shooting then followed as hereinabove related.

In the first assignment of error, it is contended that the defendant did not have a fair and impartial trial by reason of misconduct of the county attorney in his examination of certain of the witnesses. This is first directed at the cross-examination of Pauline Henson, wife of the accused. During the cross-examination of this witness the county attorney inquired as to whether the witness remembered signing a statement in the county attorney's office the night of the homicide. Several questions were asked about this. The witness admitted being in the county attorney's office and giving him a statement but she said she was so upset and worried she did not remember what she said. The matter to which this objection is directed is the fact that the county attorney never introduced the statement in evidence. However, we see no merit to this contention as the county attorney did not attempt to question the witness about the matters contained in the alleged written statement, but merely confined himself to questioning as to whether she had made and signed a statement. We can see no basis at all for concluding that the accused was prejudiced by these questions.

This assignment of error is also directed at the cross-examination of defendant relative to statements allegedly made to Tom Greer, an attorney, and it is contended that the county attorney should have known that he would be unable to use Tom Greer as a witness, because he officed with the attorney for the defendant. The record discloses that after the county attorney had asked the defendant concerning the alleged conversation with Tom Greer, that the witness Greer was called to testify in rebuttal. An objection was interposed to his testimony on the ground that he was an incompetent witness. After the objection was made, the court heard testimony and it was disclosed that the witness Greer and one of the attorneys for defendant occupied adjoining offices in the same building and used the same secretary. Based upon this, the court sustained an objection to the competency of the witness on the theory that any information conveyed to Mr. Greer by defendant was of a privileged nature because they occupied the confidential relationship of attorney and client. The trial court was giving the defendant the benefit of every possible doubt in connection with this objection, because it would appear that Greer was not incompetent as a witness. However, before we could hold that the county attorney's interrogation of the defendant was improper, we would have to conclude that he was acting in bad faith. We do not believe he was acting in bad faith but in the utmost good faith, and we are of the further opinion that the witness Greer should have been permitted to testify, as he was not the attorney for the defendant and the conversation he had with the defendant was not while a privileged relationship existed between them as attorney and client.

Counsel referred to question asked the witness Liggett with reference to the size shot used in hunting squirrels and as to what number two shot would do to a squirrel, and the witness stated he presumed number two shot would tear a squirrel to pieces. At this point, counsel for defendant objected to the testimony with reference to what the witness presumed and the court sustained the objection. It certainly would have been a rare jury if there could have been twelve men found in Seminole county who did not know that number two shot was too large to hunt squirrels.

In connection with the testimony of the witness Sowers, we do agree with counsel for defendant that the witness Sowers, when questioned as to the appearance of the defendant at the sheriff's office shortly after the homicide, stated that he was "very calm and cool just to have committed the crime he had

committed." It would have been proper for him to have described the appearance of the accused at the time he came to the sheriff's office, but it was not proper for him to state that he was in a certain state of mind "just to have committed the crime he had committed." However, the commission of the homicide by the accused was admitted. In his testimony he said he shot the deceased, and viewing this testimony from all of the facts and circumstances in evidence, we cannot conclude that it constituted prejudicial error. Especially is this true when we consider that the court struck this statement to which objection was made from the consideration of the jury.

We have very carefully viewed the various matters referred to in this assignment of error. Both the county attorney and counsel for the defendant presented the cause of the state and defendant in a very forceful and energetic manner, but occasionally their exuberance exceeded the bounds of propriety. But, on the whole, they conducted themselves in an able manner and the trial court had complete control of the trial at all times. We can find nothing in the record that would justify us in concluding that the defendant was denied a fair and impartial trial on account of the misconduct of the county attorney.

In assignment of error No. 2, it is contended that the state attempted to prove the good character of the deceased when his character had not been attacked by the defense. It is established law that in the absence of an attack by the defendant, testimony as to the good reputation of the deceased as a peaceable and law-abiding citizen is inadmissible. Coulson v. State, 48 Okla. Cr. 206, 291 P. 152; Miller v. State, 63 Okla. Cr. 64, 72 P. 2d 520.

This objection is directed principally at the testimony of J. J. Bowman, superintendent of the plant where deceased was employed. The record discloses the following questions and answers:

"Q. Was Timmy McGirt a hard working man? By Mr. Billingsley: That's objected to as incompetent, irrelevant, and immaterial, and wouldn't serve any purpose at all in this lawsuit. By the Court: It will be overruled. By Mr. Billingsley: Exception. By the Court: Exception allowed. A. Yes he was. Q. Did you ever know of any trouble that he went and got himself into deliberately? A. None whatever. Q. You say you knew Timmy McGirt for six years? A. Yes, sir. Q. He worked for you? A. Yes, sir. Q. Was he an honest man? By Mr. Billingsley: Objected to as incompetent, irrelevant, and immaterial, and leading and suggestive. By the Court: I think so. Let the witness tell what he knows about it."

After the objection was sustained to the last question, this line of inquiry was abandoned and no further questions were asked.

Only two objections were interposed. The first was overruled, and the second was sustained. The other questions were asked and answered without any objection being interposed. We do not believe this was a matter that should have been presented in the evidence of the state in chief. However, both the defendant and his wife, in testifying, referred repeatedly to the fact that the deceased was a hard worker and a good man. At various places in his testimony, the defendant referred to the deceased as:

"One of the nicest people he ever met."

"I thought he was the best friend I ever had."

"He was taking care of my folks and I really appreciated it."

"He was friendly; we never had a cross word; the finest fellow I ever met."

"We fished and hunted all the time."

"I trusted him just like I would her own father."

"He was a hard working man."

"He had a good job and worked steady."

In view of this testimony of the defendant, the evidence of J. J. Bowman as to the deceased being a hard-working man could not have resulted in prejudice to the accused.

The next assignment of error is directed at the testimony of Clem Stephenson, an attorney at Wewoka, and it is contended that the testimony of Stephenson in rebuttal concerning a conversation had with deceased about six days before the homicide should not have been admitted in evidence because Stephenson was an incompetent witness and his testimony concerned a privileged communication between attorney and client.

The statute involved provides:

"The following persons shall be incompetent to testify:

"* * *

"4. An attorney, concerning any communications made to him by his client, in that relation, or his advice thereon, without the client's consent." 12 O.S. 1951 § 385, paragraph 4.

Objection to the testimony of Stephenson was frequently interposed and this question is properly before us. The record discloses that Mr. Stephenson was the attorney for the deceased Timmie McGirt and his wife in a damage suit which had been instituted to recover damages for personal injuries. That following the discovery of the clandestine relationship which existed between the deceased and Pauline Henson, Stephenson was informed about the matter by McGirt. Stephenson testified that about three weeks before McGirt was killed, he sent Duff Kennedy to Bill Henson to see if Kennedy could not straighten out the trouble that existed between Henson and McGirt, and that Kennedy reported back that he was unable to settle the matter. That he then asked Kennedy to have the defendant come to his office so that he could talk to him. That between that date and the date of the killing, Henson came to his office four or five times. These questions were then asked Stephenson:

"Q. Did you represent Bill Henson? A. No, sir, I didn't represent Bill Henson. Q. Did you ever at any time talk to Bill Henson about employing you? A. No, he had a lawyer besides myself; he had Mr. Kidd at that time."

Stephenson then related that on Wednesday before McGirt was killed the following Tuesday, Henson came to his office to see whether Stephenson had made a settlement of the lawsuit which he had filed on behalf of McGirt and to learn whether McGirt had been able to raise some money. That previously, in conversation with Stephenson, the defendant had sought $2,500 in settlement of the damages which he claimed he had sustained because McGirt had been "fooling around with his wife." Stephenson then in the conversation with Henson made statements concerning Henson's criminal liability if he should kill McGirt but the trial court struck these statements of Stephenson from the consideration of the jury. Henson in the conversation then told Stephenson, according to the latter, that he would give McGirt until the following Saturday to do something.

Stephenson would not be an incompetent witness unless the relationship of attorney and client existed between him and Henson, and such relationship must be so regarded by the client. Howsley v. Clark, 167 Okla. 371, 29 P. 2d 947. An attorney may testify to statements made to him by a party, where the relation-

ship of attorney and client did not then exist. Potts v. Hale-Halsell Company, 150 Okla. 248, 1 P. 2d 650. The conversation between Stephenson and Henson was by Stephenson as an attorney for McGirt, and was had in an effort on Stephenson's part to settle the differences that existed between McGirt and Henson.

As hereinabove quoted from the testimony of Stephenson, it appeared that Henson had an attorney employed to advise with him and Henson came to Stephenson knowing that Stephenson was attorney for Timmie McGirt. The defendant himself testified as follows:

"Q. Do you know Clem Stephenson? A. Yes, sir. Q. Who is he? A. He's McGirt's lawyer. * * * Q. He represented Tim, didn't he, in a damage suit? A. Yes, sir. Q. Timmy was supposed to get some money out of that, wasn't he? A. That's what they tell me. Q. About how much money was he supposed to get? A. Well, I never did know. Timmy talked about it, but he talked like it would be some time. Q. Did you ever see Clem Stephenson about your trouble? A. He kept sending word until I went up and talked to him about it. * * * Q. About how long was it before you killed him? A. Oh, it was a long time, two or three weeks. Q. What did you say to him? Do you remember? A. Well, I went up to his office and after Kennedy told me to go up there, I just walked up there and told him who I was and that I 'heerd' he wanted to see me. Q. What did he say to you? A. Well, he said he had a proposition he wanted to make with me. Q. Did he tell you he had heard you were going to kill Timmy McGirt? A. No, he didn't say anything about that at all at first; he said he 'heerd' me and Timmy had made some kind of agreement; I told him we had but it looked like he had broke it. * * * Q. Didn't Clem then explain to you the law regarding matters like that? A. Clem never did explain no law to me; we never did get in that kind of talk."

We agree with counsel for defendant that the testimony of Stephenson was very damaging to the defendant, but it was a web of Henson's own weaving. For us to hold that the confidential relationship of attorney and client existed between Stephenson and Henson would be directly contrary to the proof on the question.

At no time did Stephenson occupy the privileged relationship. We think Stephenson's statement concerning the advice he gave to Henson about the complications which would have developed if he assaulted McGirt was properly stricken, not because Stephenson was an incompetent witness, but because this testimony was immaterial and not given in response to the question which was asked.

Lastly, it is contended that the best evidence rule was disregarded and thereby defendant was denied a fair and impartial trial. This is directed at the cross-examination of Bill Henson by the county attorney concerning the alleged written statement given by Henson the night of his arrest. In this examination the county attorney held up a sheet of paper and asked the defendant if he remembered signing a statement and whether the signature appearing on the paper was his and Henson said it was. The county attorney then asked Henson if he remembered the county attorney asking him "Why did you shoot Timmy McGirt?" and that Henson answered "I just shot him. He started walking toward me and I told him it was his time and just shot him."

In connection with this same assignment of error, it is contended that the county attorney inquired of Pauline Henson, wife of the accused, concerning an alleged statement given by her but did not introduce the statement in evidence.

No authorities are cited to sustain the contention that the best evidence rule was violated.

"The best evidence rule, which applies generally, if not exclusively, to written instruments, requires the production of the best evidence of which the nature of the case is susceptible. It has no application to proof of a collateral, incidental, or preliminary fact." 22 C.J.S., Criminal Law, § 692, page 1179.

Further it is stated:

"The best evidence rule is applicable generally, if not exclusively, to written instruments; it has nothing to do with the choice, credibility, or reliability of witnesses; nor does it apply to proof of the nature, appearance, and condition of mere physical objects, such as clothing or the instruments employed in the commission of the crime, it being permissible to prove these facts by parol without offering the objects themselves in evidence or explaining their non-production. Furthermore, the rule does not apply to proof of a collateral, incidental, or preliminary, fact." 22 C.J.S., Criminal Law, § 692, page 1180.

The county attorney did not attempt to vary, contradict, or alter a written instrument. His examination was directed to the question involving the recollection of the witnesses as to whether a written statement had been given. We know of no rule that would prevent the prosecutor from asking the accused if he had not made a statement to the prosecutor or some other individual at a former time which varied from the testimony given by the accused at the trial. There was no effort on the part of the state to introduce the statement or any part thereof in evidence. The case of Foster v. State, 8 Okla. Cr. 139, 126 P. 835, cited by counsel in their brief, would apply only if the state had arbitrarily selected a part of a written statement given by the defendant which was injurious to him and had attempted to introduce it in evidence and sought to omit and ignore other parts of the same statement which were favorable to him. Under the authority of this case the defendant would have been entitled to have all of the statement introduced in evidence. However, this case is not applicable because there was no endeavor on the part of the county attorney to place in evidence any part of either of the alleged statements given by the accused or his wife.

This court has given the record careful consideration. We frankly state that the defendant has aroused some sympathy of the court because of his precarious physical condition and the fact that the deceased had had adulterous relations with the wife of the accused. However, these feelings of sympathy tend to vanish when it is considered in connection with the defendant's own testimony. This was no sudden impulsive killing, spurred by the discovery of an illicit love affair between the wife of the accused and the deceased. A cooling-off period of over three weeks transpired. The defendant's aggrieved feelings would have been assuaged by the payment of $2,500, which indicates the depth of his grief. The killing was evidently premeditated. A shotgun was borrowed, shot was purchased heavy enough to kill a human, and he laid in waiting for the victim to come into view. After the first shot was fired, the killer did not appear excited but coolly ejected the shell, walked around the body, and shot the prone figure of the deceased another time. The law cannot condone such a killing. In fact, under these circumstances, the jury would have been justified in returning a verdict of guilty of murder. No doubt they gave full consideration to the health of the accused and the fact that the deceased had intermeddled in the domestic affairs of the defendant.

The judgment and sentence of the district court of Seminole county is affirmed.

POWELL, P. J., and BRETT, J., concur.