Robert O. (Bob) HURT, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12259.

Criminal Court of Appeals of Oklahoma.

Sept. 5, 1956.

Rehearing Denied Nov. 21, 1956.

Second Petition for Rehearing Denied Nov. 26, 1956.

478

David Tant, William N. Mounger, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Granville Scanland, County Atty., John M. McPherren, Asst. County Atty., Marian P. Opala, Asst. County Atty., Oklahoma City, for defendant in error.

JONES, Presiding Judge.

The defendant, Robert O. (Bob) Hurt, was charged in the District Court of Oklahoma County together with Adrian Wayne Burns and Charles Edwin York with the crime of robbery with firearms; was tried, found guilty by verdict of the jury who left the punishment to be fixed by the court. Thereafter the defendant was sentenced to serve a term of 45 years imprisonment in the penitentiary and has appealed.

A few months preceding the trial of defendant Hurt, York was tried, convicted and sentenced to serve 45 years imprisonment in the penitentiary. On appeal the conviction was affirmed. York v. State, Okl.Cr., 281 P.2d 769; In re York, Okl. Cr., 283 P.2d 567. After the conviction of York, Burns gave a written confession to the county attorney in which he implicated the defendant and York in the commission of the crime. He had not been sentenced at the time he testified for the State against the accused, Hurt, but was later sentenced to serve a term of 7 years imprisonment in the penitentiary. Although York testified in his own trial that he was innocent of the crime, he later changed his story and testified against Hurt giving substantially the same testimony as that given by Burns. After York's appeal had become final and subsequent to the lodging of the appeal by Hurt in the instant case, York again changed his testimony and at-

tempted to repudiate the evidence which he gave at the trial of Hurt.

Two assignments of error are presented: 1. The trial court erred in permitting attorney Frank Massad to testify concerning alleged confidential communications between Massad and the defendant. 2. Trial court committed error in permitting the State to play to the jury an edited tape recording of a conversation alleged to have occurred between Massad and defendant.

The proof of the State showed that Gurley B. Lenn was robbed at his home by two masked bandits in the early morning hours of August 25, 1953, in Oklahoma City. The robbers acted in a cruel and inhuman manner. When Mr. and Mrs. Lenn entered their home about 9:00 P.M. on August 24, they found two masked men on the inside of their house. These two men gagged Mr. and Mrs. Lenn and securely bound them with window sash cord. After that they began abusing the Lenns in an effort to force them to disclose the alleged hiding place of a large amount of money which the robbers claimed was hidden about the premises. For over 7 hours the robbers tortured Mr. Lenn by sticking a red-hot soldering iron or electric hair curler into the rectum of Lenn which caused severe pain and very great physical injury to Lenn. Lenn disclosed to the robbers the hiding place of $5,000 in currency and the robbers took that amount of money together with several diamonds, watches and guns and left the premises just before daylight on August 25.

Burns was a constable at Cordell and also operated a gambling game. The Lenns were manufacturers of gambling equipment and had sold to Burns a dice table by which the throw of the dice could be controlled. Burns was also well acquainted with Hurt, having visited in Hurt's home. The record also disclosed that Mr. and Mrs. Hurt and the Lenns had been intimate friends for several years, making frequent visits to each other's homes and on at least two occasions had made extended vacation trips together. The Lenns were possessed of a vicious watchdog named Sunday which would attack strangers. This dog was left at the home of the Lenns on the evening of August 24 when the Lenns went out to eat their evening meal. When they returned to their home the dog met them at the door and Mrs. Lenn put the dog out the back door into the enclosed back yard before she and Mr. Lenn were confronted by the two masked men.

Burns and York testified in substance that they committed the robbery at the suggestion of Hurt. Burns said that Hurt had asked him repeatedly over a period of several weeks to commit the robbery and told him that he knew that Lenn had several thousand dollars hidden or buried around his place. Burns procured York, whose home was in Tulare, California, but who had visited in Cordell where he worked temporarily for Burns, to assist in the robbery.

According to Burns and York, Hurt accompanied them to the Lenn residence where Hurt opened a window and entered the house so that he could control the vicious dog. Hurt stated that he had become well acquainted with the dog and could control him. After Hurt had entered the house he opened the back door for Burns and York to enter and then Hurt left the premises. After the robbery Burns delivered two one thousand dollar bills to Hurt together with some diamonds and a gun which Hurt had loaned to York for use in the robbery.

Roy Burns, brother of Wayne Burns, and Viola York, mother of Edwin York, corroborated a part of the testimony of Burns and York by relating conversations which they had with the defendant Hurt while the trial of York and Burns was pending. The most damaging evidence to defendant's cause, however, came from the testimony of Frank Massad, an attorney of Oklahoma City. Over the vigorous objection of counsel for the accused, Massad was permitted to detail conversation which he had with Hurt on many occasions. During one of these conversations Massad, unknown to Hurt, was equipped with a wire

recorder which recorded incriminating statements made by Hurt. This recording was edited by the trial court in the absence of the jury and the edited version of the conversation was played to the jury over the objection of Hurt.

Hurt's defense was an alibi. He contended that at the time of the robbery he was playing pool in Jerry's Pool Hall in Oklahoma City with one Art Nugent. Several witnesses corroborated the defendant on his alibi. Defendant specifically denied any connection with the robbery but admitted knowing Burns and testified that he had been hired by attorney Tant to try to find some evidence to sustain an alibi for Burns to be introduced at the trial of Burns.

In connection with the first assignment of error, the record discloses that at the time objection was made to the testimony of Massad, the jury was excused and the court heard many witnesses on the question as to whether Massad was the attorney for Hurt. Massad denied that he was ever the attorney for Hurt but contended the conversations he had with Hurt were because of the relationship between Hurt and Burns and Hurt was attempting to help prepare for the trial of Burns by talking to Massad and Tant who were representing Burns. On the other hand, Hurt testified that the night that Burns was arrested and charged with the crime, Massad came to Hurt's home and informed Hurt that some of the policemen were trying to implicate Hurt in the robbery and that on that occasion Hurt told Massad he wanted him for his attorney and Massad agreed. However, on cross-examination Hurt testified that Massad did not become his attorney until charges were filed against Hurt on May 13, 1954, and that when perjury charges were filed against Massad in Oklahoma County on August 12, 1954, that he no longer considered Massad as his attorney because he felt that on account of the bad publicity which Massad had received, Massad would do him more harm than good. Hurt testified, however, that he never did discharge Massad as his attorney

but that he just let him sort of "ease out." At the conclusion of the hearing in the absence of the jury the trial court made its ruling in which he divided the testimony of Massad into three periods. The court held that during the first period of time which commenced with the arrest of Burns and ended on May 13, 1954, Massad was not acting as attorney for Hurt and that any conversation which occurred during that period was admissible in evidence against Hurt. The second period of time was from May 13, 1954, to August 12, 1954, and the court found that during that period of time, contrary to the testimony of Massad, that the relationship of attorney and client did exist between Massad and Hurt and that any conversation between them during that period was privileged and inadmissible as evidence against Hurt over objection.

The court held that on August 12, 1954, the relationship of attorney and client was dissolved between Massad and Hurt and that any conversation which occurred between them after that date was admissible as evidence.

As to the relationship of Massad and Hurt, Hurt testified:

"Q. Then I take it that it necessarily follows that prior to the day of your arrest, Mr. Massad was not in any manner or sense employed by you as your attorney; is that correct? A. Correct. That is exactly correct.

\* \* \* \* \* \*

"Q. He doesn't represent you in this case that is on trial now? A. No; he doesn't represent me after you filed that perjury charge against him, I didn't want him in my case.

"Q. When was that? A. I don't know, two or three months ago.

"Q. Did you discharge him then? A. I didn't discharge him, didn't do a thing. I just let him ease around. I didn't want to make the man mad because I knew he was poison.

\* \* \* \* \* \*

"Q. He is not your attorney now? A. No; he is not·my attorney right now.

"Q. When did he cease to be your attorney?

"Mr. Tant: I object to that.

"A. I never fired him. I just let him out."

 The statute involved provides: "The following persons shall be incompetent to testify: * * * 4. An attorney, concerning any communications made to him by his client, in that relation, or his advice thereon, without the client's consent." 12 O.S.1951 § 385.

In the early case of Evans v. State, 5 Okl. Cr. 643, 115 P. 809, 810, 34 L.R.A.,N.S., 577, this court held:

"The statute which provides that an attorney shall not be compelled to testify 'concerning any communication made to him by his client, in that relation or his advice thereon without the client's consent,' is but declaratory of the common law, and should be fairly construed and applied according to the plain import of its terms; the statute is for the benefit of the client, not the attorney.

"An attorney is employed in his professional capacity when he is voluntarily listening to a client's preliminary statement. It is not necessary that any retainer should have been promised, paid, charged, or demanded, and it makes no difference even though the services are gratuitous."

In the body of the opinion the court quoted from Professor Wigmore with approval as follows:

" 'It follows that a communication to an attorney, not in his capacity as such, is without the privilege if made before the relation was entered into or after it was ended.' "

In 58 Am.Jur., Witnesses, § 483, it is stated:

"Where only a part of a communication between an attorney and client is privileged, if the privileged and unprivileged parts, may be safely separated it seems that the privileged matter only will be excluded. But if the separation is involved in difficulty, the whole will be excluded."

Where a party objects to the introduction of evidence on the ground that it involves a privileged communication between attorney and client, the burden is upon the one making the objection to show the relationship of attorney and client and other facts to bring the evidence within the terms of the statute pertaining to privileged communications. 58 Am.Jur., Witnesses, § 520; McGrede v. Rembert National Bank, Tex. Civ.App., 147 S.W.2d 580; Phelps Dodge Corp. v. Guerrero, 9 Cir., 273 F. 415; Childs v. Merrill, ·66 Vt. 302; 29 A.· 532. It presents a question of fact for the determination of the trial court and the finding of such court upon conflicting evidence is controlling on appeal. 58 Am.Jur., Witnesses, § 482; Rowland v. State, 75 Okl.Cr. 164, 129 P.2d 609. In Henson v. State, 97 Okl.Cr. 240, 261 P.2d 916, 917, this court held:

"An attorney would not be an incompetent witness against accused unless the relationship of attorney and client existed between the attorney and accused, and such relationship must be so regarded by the accused."

To the same effect is Potts v. Hale-Halsell Co., 150 Okl. 248, 1 P.2d 650. We think the law amply sustains the trial court in dividing the relationship between Massad and the defendant Hurt into three periods, the first being from the date of the arrest of Burns in September, 1953, down to the date charges were filed against Hurt on May 13, 1954. During that period Massad was acting as attorney for the codefendant, Burns, and according to the testimony of Massad which is bolstered in large part by the testimony of the defendant, no attorney-client relationship between Hurt and Massad existed, but Hurt was doing his utmost to assist in procuring alibi witnesses to be used. in the defense of Burns. The second period from May 13, 1954, to August 12,

1954, was the interval fixed by the court as the period during which Massad acted as attorney for Hurt and no testimony as to any communications made during that period was admitted in evidence. On August 12, 1954, perjury charges were filed against Massad. Hurt testified that he did not want him as his attorney after that for the reason that he thought Massad would hurt him more than he would help him and he just let him ease out of the case. The wire recording which contained the conversation between Massad and Hurt was taken on October 20, 1954. Part of this conversation occurred in an automobile and part of it at Marsh's Drive-In Restaurant in Oklahoma City. Unknown to Hurt, Massad had concealed a wire recorder on his body and the entire conversation was taken on the wire recorder and later transcribed and reproduced on a tape recorder. The conversation on the tape recorder was played in its entirety by the trial judge in the absence of the jury and some wholly irrelevant and profane matters were deleted and the remainder was played to the jury. The defendant Hurt in his testimony admitted that the recording as played to the jury contained substantially the statements which he and Massad made to each other at the time and place in question. This conversation between Massad and Hurt occurred more than two months after Hurt said that he had let Massad ease out of his case as an attorney and occurred subsequent to a time when Hurt's attorney, Mr. Tant, had conferred with Hurt concerning the possibility of Massad being used as a witness against him.

We think that it would be improper and unfair to exclude testimony involving a communication between attorney and client while such relationship was in existence and then after the relationship had terminated to permit the attorney through artifice to have the client repeat much of the privileged conversation for the purpose of enabling the attorney to testify in court regarding such privileged communication. See Yordan v. Hess, 13 Johns., N.Y., 492, where the court said:

"The confessions by plaintiff to Brackett were made after he ceased to be his attorney; and although they were, substantially, a reiteration of what had been communicated whilst the relation of attorney and client existed, yet they appear to have been voluntary disclosures, in no way sought for or drawn out by the witness. An attorney cannot, after he ceases to be the attorney of a party, disclose what was communicated to him in that capacity. But this is the privilege of the client, and if he chooses, after this relation has ceased, to volunteer any communications, he is not protected, although they may be, in substance, the same as were given while that relation subsisted. The reason for the rule then ceases. If a repetition of the information should appear to have been drawn out by any artifice, for the purpose of being used as evidence, it ought not to be received. But when it is perfectly voluntary and unsought for, there can be no solid ground for excluding the evidence."

Here, however, there was no contention by the accused at the time the tape recording was introduced in evidence that it constituted a reiteration of communication between Massad and Hurt while the privileged relationship of attorney and client was in existence.

Since the trial court separated the privileged communications from the unprivileged communications after a hearing on the question in the absence of the jury, we are of the opinion that we should uphold the ruling of the trial court unless the record shows that the communications were so intertwined that they could not be separated. In that connection, since the principal testimony of Massad was in connection with the introduction of a wire recording of a conversation which occurred between Massad and Hurt on October 20, 1954, it is pertinent to refer to such recorded statement to ascertain the

attitude of Hurt toward Massad. In considering this recorded statement it should be borne in mind that it was given approximately two months after Hurt said that he no longer considered Massad as his attorney because perjury charges had been filed against Massad in connection with another criminal action. In the recorded conversation it is shown that Hurt accused Massad of planning to testify against him and at one point Hurt asked Massad whether he had a recording device on him. It is apparent that Hurt made the incriminating statements contained in the wire recording to Massad at a time when he no longer considered Massad as his attorney and he made those statements after his attention had been called by attorney Tant to the fact that Massad probably would be called to testify against Hurt. Under such a state of the record we feel that the conversation which Hurt had with Massad on that occasion was not privileged. It was no more privileged at that time than a conversation which Hurt might have had with a total stranger because he was making disclosures to Massad knowing that Massad might be called as a witness against him and knowing that Massad was no longer his attorney and would not represent him at the trial.

This brings us to the second contention of the accused, that the court erred in permitting the State to play to the jury the edited tape recording of the conversation between Massad and the defendant. When the State first attempted to introduce the tape recording in evidence, it was shown that the conversation between Massad and Hurt was first recorded on what is known as a wire recorder; that later a copy of the wire recording was made on a tape recorder so that the sound would be more audible, and that the wire recording had been lost or destroyed. The tape recording was played to the court in the absence of the jury. It contained a large amount of wholly irrelevant matter not pertaining to the case and also many vulgar and profane statements which the court ordered deleted before permitting the tape recording to be played to the jury. The deletions on the tape recording were supervised by the court. At the time this edited tape recording was introduced in evidence, counsel for the accused objected to the introduction of such recording for the reason that the tape recording was merely a purported copy of the original wire recording and not the best evidence.

■ When the defendant Hurt was testifying, he admitted that the tape recording reflected solely his voice and that of Massad and that it was a true reproduction of the conversation had between him and Massad on October 20, 1954. In the case of Williams v. State, 93 Okl.Cr. 260, 226 P.2d 989, 995, this court thoroughly discussed the admissibility of wire recordings. This court discussed the advantage to be gained by courts utilizing modern methods of science in ascertaining facts. We quoted from the case of Commonwealth v. Clark, 123 Pa.Super. 277, 187 A. 237, wherein it was stated:

"'The phonograph, the dictaphone, the talking motion picture machine, and similar recording devices, with reproducing apparatus, are now in such common use that the verity of their recording and reproducing sounds, including those made by the human voice in conversation, is well established; and as advances in such matters of scientific research and discovery are made and generally adopted, the courts will be permitted to make use of them by way of presenting evidentiary facts to the jury.'"

In the body of the opinion we stated:

"It is our conclusion after fully considering this question that the rules determining the admissibility of a confession taken on a phonographic record or on a wire such as in the instant case or a disc are to be determined by the same rules as govern the taking of a confession by shorthand, which is later transcribed. That is, the party offering the wire recording in evidence must make a showing

with reference to its preparation, that is, whether the mechanical device was sufficiently capable of taking the confession; and also there should be a proper showing as to the manner of the preservation of the wire recording, that is, as to whether any changes have been made, deletions, or additions to the recording, and of the correctness. The genuineness or the authenticity of the recording must be established. The contention of counsel that the recording should have been rejected because the evidence disclosed that the wire may be erased or otherwise changed likewise applies to a confession which is taken by a court reporter in shorthand and later transcribed. The rules as to the authenticity or genuineness of the confession are the same. If the party objecting to the confession can make a showing that it has been erased or deleted or changed in any manner the court would sustain an objection to its admissibility. The wire recorder which reproduces the actual voice of the accused and those who may be questioning him should be of much more value to the court and the jury than a confession taken in shorthand and later reduced to writing, especially where an issue has been raised as to whether the confession was voluntarily made."

In the recent case of Thompson v. State, Okl.Cr., 298 P.2d 464, it was held:

"A tape recording secretly made, without the knowledge or consent of defendant, of conversation between defendant and another prisoner in adjoining cells, properly identified, is admissible in evidence."

The Attorney General has cited the case of State of Washington v. Lyskoski, 47 Wash.2d 102, 287 P.2d 114, 117, as being squarely in point with the question here raised. In that case it is stated:

"After Edwards started collaborating with the prosecuting attorney's office in the instant case, Marvin Sten-holm, chief investigator for the office, rented a miniature battery-powered 'Minifon' wire recorder from Electricraft, Inc., and showed Edwards how to operate it with the recorder concealed in his belt and the miniature microphone in his shirt pocket.

"Being thus equipped, Edwards telephoned appellant at about three p. m. on April 20, 1954, in an effort to elicit some admissions from him. This conversation was recorded, but, when it was played back in Stenholm's office, it proved to be partially unintelligible. Edwards made a second call which proved to be more intelligible. Edwards then arranged for a meeting that evening. They sat in appellant's car outside the China Pheasant cafe, where a conversation of approximately an hour between Edwards and appellant was recorded. These original wire records are inaudible without the aid of earphones.

"Later, Chief Stenholm took the wire recording to Electricraft, Inc., and a Mr. Runchey 'dubbed' the conversations from the original wire recording, by a standard reproduction process, to a tape recording, which can be played audibly without recourse to earphones. Stenholm and Edwards testified that they listened with earphones to the original recordings and Stenholm was present when Runchey made the audible tape recording.

"The original wire recording is the state's exhibit No. 59, and the audible tape recording 'dubbed' from the original is the state's exhibit No. 60.

\* \* \* \* \* \*

"Appellant contends that the exhibits were not properly identified. We do not agree. They were traced from the time of making the original recording until they were admitted in evidence, and Edwards testified, after the recording had been played for the jury, that the voices were those of appellant and himself.

"Appellant contends that the audible tape recording is secondary evidence and is not admissible because the best evidence is available.

"The audible tape recording bears the same relationship to the inaudible wire recording that a photograph bears to a negative. No good purpose would be served by not following the rule applicable to them. See 3 Wigmore on Evidence (3d ed.) 196, § 796. We hold the tape recording was admissible."

It is our conclusion that the court acted properly in editing the tape recording and eliminating the irrelevant matter; that the State made a sufficient showing of the authenticity of the recording to permit its introduction as evidence and that the authenticity of such recording was further established by the admission of the accused in his testimony that it was a reproduction of the conversation had between him and Massad.

Affirmed.

BRETT and POWELL, JJ., concur.